DACON v TRANSUE

Docket No. 90339. Argued January 8, 1992 (Calendar No. 7). Decided
    September 29, 1992.

    Walter Dacon, as next friend of Ericca M. Dacon, a minor,
        brought a medical malpractice action in the Wayne Circuit
        Court against Drs. David J. Transue, Thomas E. Lee, Mon K.
        Kim, and St. John Hospital, alleging that failure to provide
        appropriate treatment or medication in appropriate dosage or
        duration, specifically in failing to administer chloramphenicol,
        to Ericca for meningitis, caused neurological damage. The
        court, Maureen P. Reilly, J., after determining that the
        plaintiff's use of the term "appropriate treatment" in his
        pleadings was too vague to amount to an allegation of liability
        based on delay in beginning treatment, denied the plaintiff's
        request to amend his pleadings to allege that theory. The jury
        found that although the pediatricians had committed malprac-
        tice in their choice of medication, it was not the proximate
        cause of Ericca's injuries, and that St. John Hospital had not
        committed malpractice. The court found no cause of action. The
        Court of Appeals, GRIBBS, P.J., and SHEPHERD and DOCTOROFF,
        JJ., affirmed in an unpublished opinion per curiam, holding
        that the plaintiff's theory regarding delay in beginning treat-
        ment was properly excluded because the allegation of failing to
        provide appropriate treatment did not provide reasonable no-
        tice to the defendants of the allegation of delay (Docket No.
        95871). The plaintiff appeals.

    In an opinion by Justice BRICKLEY, joined by Chief Justice
        CAVANAGH and Justices RILEY and GRIFFIN, the Supreme Court
        held:

        The trial court's determination that the plaintiff did not
        comply with MCR 2.111 in failing to provide reasonable notice
        of the theory of delay in the beginning of treatment was
        correct; the pleadings offer general conclusory allegations that
        did not provide reasonable notice. The decision to deny the
        plaintiff's request to amend his complaint to add that theory
        also was correct. MCR 2.118(C)(2) clearly indicates that an offer
        to amend pleadings during trial should be rejected unless it is
        affirmatively established that the adverse party would not be
        prejudiced. The plaintiff neither made nor requested to make

such a showing. The plaintiff did not show that the trial court abused its discretion in applying its decision.

1. A complaint must provide reasonable notice to opposing parties. To assert a theory of liability, MCR 2.111(B)(1) specifies that an allegation must state the facts, without repetition, on which the pleader relies, and state the specific allegations necessary reasonably to inform the adverse party of the claims. In this case, the plaintiff's allegation that the pediatricians did not provide appropriate treatment or medication in appropriate dosage or duration did not refer specifically or generally to any facts. By alleging everything, it alleged nothing. The trial court did not abuse its discretion in distinguishing between the theory that Ericca may have suffered injury because of the failure to administer a particular medication and the theory that she may have suffered injury because of delay in the initiation of therapy, and in excluding the latter theory.

2. MCR 2.118(C)(2) establishes strict requirements for amending a pleading during trial, requiring the requesting party to satisfy the court that the amendment would not prejudice the objecting party. Because the plaintiff neither made this showing nor asked to make it, the trial court correctly denied his request to amend. In addition, the court correctly ruled that he had not provided reasonable notice to the defendants and that amendment would cause prejudicial surprise. A plaintiff may not rely upon a facially insufficient allegation, which necessitated amendment, to alleviate prejudicial surprise caused by the amendment.

3. The trial court properly applied its decision that the plaintiff did not plead delay in the administration of antibiotics as a violation of the standard of care. It did not exclude evidence of causation.

Justice BOYLE, concurring, stated that the sole issue is whether the trial court erred in refusing to allow the plaintiff to amend his pleading during trial to additionally allege that the defendants were liable for delaying the initial administration of antibiotics. The complaint failed to set forth facts regarding such a delay, and the plaintiff failed to provide answers to interrogatories that could have sharpened the issues sufficiently to provide adequate notice of the theory in advance of trial. In addition, the plaintiff's mediation summary and opening statement focused on the defendant's failure to treat. While the plaintiff's theory might have been adequate under MCR 2.111, it was not adequate notice under MCR 2.118(C)(2). Motion practice, discovery, education, and the considerable management authority of the trial court are designed to insure

that, in all but the rarest instances, the parties to civil litigation know what issues are to be tried and how they will try them. The trial court's refusal in this case was not an abuse of discretion.

Affirmed.

Justice LEVIN, joined by Justice MALLETT, dissenting, stated that because the defendants were fully and adequately informed by the plaintiff's mediation statement and her expert witness' deposition of her theory that Drs. Kim and Lee violated the standard of care in failing to administer correct medication within one hour of her admission to St. John Hospital, and that time is of the essence in treating a child with bacterial meningitis, her failure to seek to amend her complaint to state that theory does not justify excluding expert testimony supportive of it.

Just as it might be unfair to a defendant to introduce a new issue at the trial, so, too, is it unfair to a plaintiff to ignore the actual notice of the plaintiff's claims that the defendant has received in discovery depositions, answers to interrogatories, mediation statements, or other documents filed before trial. To deny a plaintiff an opportunity to present evidence in support of a theory of recovery of which the defendants have had such full and fair notice is to reintroduce extreme formalism tantamount to the straightjacket of ancient forms of action. If specific facts developed during discovery, on deposition or in response to interrogatories, must be fully stated in the complaint to avoid the peril of exclusion, it will become necessary for plaintiffs, after discovery has been completed, to seek to amend their complaints to set forth the specific facts developed during discovery.

Implicit in the claim that the defendants were on notice that the plaintiff claimed that they had failed to provide an effective antibiotic is the claim that an effective antibiotic should have been timely administered, initially and subsequently. The trial court's rulings striking and barring testimony concerning the urgency of the timely administration of effective antibiotic therapy not only excluded evidence concerning the urgency of avoiding delay in administering antibiotic therapy during the first three and one-half hours the plaintiff was in the hospital, but also excluded evidence concerning the urgency of avoiding delay in administering antibiotic therapy during the first twenty-four hours that she was in the hospital.

The evidence that was stricken regarding the hour at which antibiotic treatment should have begun was probative not only of the standard of care but also of the issue of causation. In

striking the plaintiff's expert witness' trial testimony concerning the hour when the administration of antibiotics should have begun, and in barring cross-examination of the defendants' expert witness and of defendant treating physicians concerning the hour when the administration of antibiotics should have begun, the court effectively barred the plaintiff from introducing probative evidence concerning the issue of causation, evidence that may have persuaded the jury that the twenty-four-hour delay in administering chloramphenicol was causally related to her right-sided hemiparesis and seizures.

The question of choice of medicine and the question of timing and delay in medicating the plaintiff were inextricably interrelated. Ultimately, the only issue that there could have been in this case was whether any departure from the standard of care found by the jury in choice of medicine and in delaying until the second day of hospitalization the administration of chloramphenicol was a cause of the right-sided hemiparesis and seizures. It was extraordinary to rule that the issue of choice of medicine should be tried, but to bar the plaintiff from effectively trying the issues of standard of care and causation.

*Bleakley & McKeen, P.C.* (by *Thomas H. Bleakley*); *Bendure & Thomas,* of counsel (by *Mark R. Bendure*), for the plaintiff.

*Schureman, Frakes, Glass & Wulfmeier* (by *Cheryl L. Chandler* and *Priscilla L. Schwarze*) for defendants Transue, Lee and Kim and their professional corporation.

*Portnoy, Leader, Pidgeon & Roth, P.C.* (by *Robert P. Roth* and *Marc S. Berlin*), for St. John Hospital.

BRICKLEY, J. "[T]his is a medical malpractice action relating to the failure to administer chloramphenicol to Plaintiff's Minor, who was suffering from meningitis."[1] This appeal concerns whether the trial court abused its discretion by excluding the theory, first raised by plaintiff on

[1] Plaintiff's Response to Defendant Hospital's Motion for Protective Order and To Set Expert Witness Fees, April 10, 1985.

the third day of trial, that defendants should also be liable for delaying the initial administration of antibiotics to Ericca. Because plaintiff neither pleaded this theory nor justified amending his pleadings to include it, we decide that the trial court did not abuse its discretion and affirm.

I

In April, 1974, nine months after she was born, Ericca Dacon suffered from a series of illnesses. Starting innocuously around April 11, they worsened progressively, culminating in bacterial meningitis by month's end. On April 11, Ericca fell out of her crib and hit her head. Mrs. Dacon took her to the family pediatricians, Drs. Transue, Kim, and Lee. Dr. Mon Kim examined her and diagnosed a contusion of the head. Later that week, on April 15, Mrs. Dacon brought Ericca back to the pediatricians because she had developed a fever since the last visit. Dr. Thomas Lee treated Ericca that day and diagnosed an infection of the left inner ear. After prescribing Ilosone, an antibiotic, Dr. Lee sent Ericca home. Ericca's condition then deteriorated considerably. On April 16, Ericca was admitted to Children's Hospital. Dr. Green, who had treated Ericca for a congenital heart defect, diagnosed her condition as pneumonia and started her on Bicillin, a penicillin-family antibiotic. When Ericca was released from the hospital three days later, doctors prescribed oral ampicillin, which her mother gave to her for the next five days. When the ampicillin ran out on April 26, Dr. Lee saw Ericca. He prescribed Pen-Vee K, a penicillin-family antibiotic, and sent her home.

Three days later, on April 29, Mrs. Dacon took Ericca back to the pediatricians. This time Dr. Kim saw her. He examined Ericca, who appeared

normal. As Mrs. Dacon was leaving, however, she mentioned that Ericca cried whenever her neck was pushed forward. Recognizing that such rigidity can be a symptom of meningitis, Dr. Kim immediately performed a physical examination, searching for further symptoms. He then ordered a complete blood count for Ericca. Informing Mrs. Dacon that he suspected meningitis, Dr. Kim prescribed Pediamycin and Dimetapp and sent mother and daughter home to await further instructions.

When the blood count came back, Dr. Kim told Mrs. Dacon that Ericca should be taken to St. John Hospital. She was admitted soon thereafter at 2:40 P.M. The intern on duty, Dr. Savin, performed a spinal tap, which revealed "grossly cloudy" spinal fluid. Dr. Savin sent the fluid on for laboratory analysis. When that analysis returned, Dr. Savin diagnosed Ericca's condition as partially treated bacterial meningitis. Ericca was given ampicillin at 6:00 P.M. on April 29, 1974.

Performing his regular rounds the next day, April 30, Dr. Lee visited Ericca. She had improved little. He then decided to add chloramphenicol, another antibiotic, to the ampicillin Ericca had been receiving. The first dose of chloramphenicol was given in the afternoon on April 30. From that point forward, Ericca's illness slowly but steadily improved. Although the infection got better, nurses noticed ominous neurological signs. Ericca seemed to favor one side of her body more than the other. The physicians, realizing that neurological complications often result from meningitis, attempted to halt the deterioration. By the time the illness had run its course, Ericca suffered from a generalized muscle weakness on the right side of her body known as right-sided hemiparesis and periodic seizures.

II

Eight years after Ericca's bout with meningitis, Mr. Dacon, as next friend, sued both St. John Hospital and the family pediatricians. The complaint alleged that both defendants had committed malpractice and sought damages for Ericca's injuries. The genesis of this appeal lies in paragraph 10(a)(7) of that complaint. Instead of specifying as precisely as possible what Ericca's pediatricians did wrong, plaintiff merely alleged that they failed to provide "appropriate treatment and/or medication in appropriate dosage and/or duration." In an attempt to get behind this studied ambiguity, defendants served an interrogatory requesting that plaintiff specify what "appropriate treatment" meant and how they failed to provide it.[2] Plaintiff chose not to answer directly. The only response defendants received was that plaintiff could not specify any particular breaches of the standard of care and that defendants could discover this information from plaintiff's experts later.[3] At this point, the matter rested.

Plaintiff's other allegations were more concrete than his allegation in paragraph 10(a)(7). He alleged that Ericca's pediatricians did not provide acceptable office treatment. These allegations focused on practices such as taking a medical his-

[2] The interrogatory read: "Set forth specifically what 'appropriate treatment and/or medication in appropriate dosages and/or duration' you have reference to as stated in paragraph 10-A 7 of your complaint. Set forth when the standard of practice requires this treatment or medication. Be specific."

[3] Plaintiff responded by referring defendants to a response to a similar question: "I have been informed by my attorneys that the subject matter of this Interrogatory is one that calls for expert testimony. Discovery has not yet progressed to the point where expert witnesses can be identified. Upon completion of discovery and after expert witnesses have been selected for the purposes of testifying, plaintiff will further timely supplement answers to these interrogatories." Plaintiff never supplemented this answer.

tory, doing a physical examination, and referring Ericca to specialists. Although referred to during testimony, plaintiff's theory of the case did not hinge on them.[4]

Plaintiff's theory focused on the medication Ericca received from her pediatricians. This theory evolved from three allegations in her complaint. She alleged that her pediatricians should have included ampicillin-resistant meningitis as a potential diagnosis of her problems, that they should have determined whether she did suffer from ampicillin-resistant meningitis, and that they should have made a presumptive diagnosis of ampicillin-resistant meningitis. From these three allegations, the parties assumed that "appropriate treatment" meant treatment with a drug other than ampicillin. Their mutual understanding was stated simply by plaintiff in response to defendant's motion for a discovery-only deposition: "[T]his is a medical malpractice action relating to the failure to administer chloramphenicol to Plaintiff's Minor, who was suffering from meningitis."[5] Plaintiff linked the failure to provide effective antibiotics to Ericca's complications with a powerful, straightforward theory. If the physicians had administered effective medication on April 29, Ericca would have recovered, thereby preventing her hemiparesis and seizures.

With this understanding, all parties prepared for trial. Three days before trial started, however, plaintiff's counsel made a startling discovery. Reading Ericca's medication chart closely, he no-

---

[4] At trial, the essential claim was that Dr. Kim should not have prescribed Pediamycin for meningitis. All medical testimony agreed that to have done so would have been inappropriate. Dr. Kim contended that he did not prescribe Pediamycin for meningitis, but, rather, to respond to the dangers of infection resulting from Ericca's congenital heart defect.

[5] See n 1.

ticed for the first time that Ericca received ampi-
cillin at 6:00 P.M. on April 29. This discovery
surprised him because he had assumed all along
that she had first received ampicillin at 1:00 P.M.
on April 29.[6] Plaintiff's counsel kept this informa-
tion and its implications to himself.

The trial began smoothly. Momentary difficulty
arose when defendants moved for a directed ver-
dict after plaintiff's opening statement because it
did not specify a concrete theory of liability. The
judge agreed, but allowed plaintiff's counsel to
give another opening on the second day of trial.
He did so and convinced the judge not to direct a
verdict against his client. There was no mention of
the information plaintiff's counsel had found in
Ericca's medication chart.

On the third day of the trial, plaintiff started
the presentation of his case. In response to a
hypothetical question posed by plaintiff's counsel,
plaintiff's expert witness, Dr. Mark Thoman, testi-
fied that treatment should begin within an hour of
diagnosis. Defendants immediately objected,[7] argu-
ing that choice of medication, not delay in making
a diagnosis, had always been the issue in the case.

---

[6] Of course, this assumption was open to serious doubt because
Ericca was admitted to St. John Hospital at 2:40 P.M. on April 29.
Plaintiff's counsel later explained that he thought the time was
3:00 P.M., which would be 1500. Whichever incorrect time plaintiff's
counsel believed, it is clear he did not know that ampicillin was first
given at 6:00 P.M. on April 29.

[7] As the dissent points out, Dr. Thoman referred to when antibiotics
should start once before defendants objected. From this, the dissent
infers that defendants were fully on notice of this claimed negligence.
A careful examination of the record indicates differently. When Dr.
Thoman first mentioned when antibiotics should begin, it was in
response to a general statement of good medical practice. Nothing in
the context or the question indicates that this described the applica-
ble standard of care, see, generally, *Lince v Monson, 363* Mich 135,
139-140; 108 NW2d 845 (1961), or that defendant pediatricians had
somehow violated the standard of care. When plaintiff did suggest
that Dr. Kim violated the standard of care in this regard, defense
counsel moved to strike the answer.

The judge then asked plaintiff's counsel to show where the pediatricians' failure to timely treat Ericca had been alleged. Although he had not known about the short delay in treatment until three days before trial, plaintiff's counsel represented to the court that it had, in fact, been alleged because delay in treatment was a failure to provide appropriate treatment. After ascertaining that plaintiff had not responded to the pediatricians' request to clarify the meaning of "appropriate treatment," the judge ruled that appropriate treatment was too vague to provide reasonable notice to defendants and struck the witness' answer.

Plaintiff's counsel vigorously opposed this decision. His major argument was that the complaint had, in fact, properly notified defendants of the theory he discovered three days before. Counsel added another argument. Although never offering to show that defendants would not be prejudiced, he asked permission to amend his complaint to allege the new theory. The judge denied this request as well. The issue arose again a number of times during trial as plaintiff's counsel attempted to find new ways to get the new liability theory into evidence. The trial judge listened to argument on the issue several more times and each time blocked plaintiff's attempts.

Even after the court's ruling during Dr. Thoman's testimony, plaintiff attempted to examine Dr. Kim regarding the standard of care with respect to the timing of therapy. After much discussion, the court again ruled such questions inadmissible. Plaintiff sought clarification of the court's exclusionary ruling at the beginning of testimony the next day. The court made it clear that only standard of care evidence regarding the hour at which antibiotics should have begun was inadmis-

sible. Plaintiff could, the court indicated, present causation evidence linking Ericca's injuries to untreated meningitis.[8] Counsel for the parties then drafted a cautionary instruction to prevent any confusion that may have arisen from plaintiff's repeated attempts to introduce inappropriate stan-

---

[8] *The Court:* I don't know how to say it any more simply [than] the time of medication that was given is not the issue. The kind of medication that was given is the issue.

\* \* \*

Mr. Bleakley, can I have [your] assurance that you will refer to the giving of medication by day rather [than] hour?

*Mr. Bleakley:* You have my assurance.

And just so I'm clear, I'm planning on arguing on proximate cause basis that a delay of one day of administering the appropriate antibiotics caused this child's brain damage.

*The Court:* Do you have any problem with that?

*Mr. Roth:* No.

*Mr. Bleakley:* That's all—I think you have instructed the jury now and that's the reason I've requested the cautionary instruction.

I think that you have removed that issue from the jury by your instructions, you see.

You have said to them, time is not an issue in this lawsuit. And time is an issue in this lawsuit as to the—not the appropriateness of the administration of Ampicillin at 6:00, but it's an issue as to whether or not the delay in administering the appropriate antibiotic reasonably medically probably caused the child's condition.

\* \* \*

*The Court:* None of us have the problem with—when you say there was a delay of one day.

And when we have the instructions, we will make . . . clear the reason.

I have no problem with that because when the child was brought in on the first day, it's your position and I believe you have claimed this clearly, that Ampicillin was given and Ampicillin should not have been given, the Chlor-Amphenicol should have been given.

*Mr. Bleakley:* That's correct.

*The Court:* And the proper one was not given until the next day.

\* \* \*

*The Court:* I have no problem with that. I take it there will be no objections then if he poses it in that way?

dard of care evidence. Upon agreement from all the parties that the instruction fairly reflected plaintiff's theory as pleaded,[9] the court cautioned the jury in these words: "The timing as to when the initial antibiotic therapy was administered at St. John's [sic] Hospital on April 29, 1974 is not an issue in the case. You may consider, however, the Plaintiff's claim that the appropriate antibiotic therapy was not started on April 29, 1974." (Instructions of the court.) After this, plaintiff presented the rest of his case and rested before the delay theory again became an issue.

In spite of his assurances to the court, plaintiff raised the delay theory once more during his cross-examination of Dr. Adnan Dajani, defendants' expert witness. He asked Dr. Dajani whether he "would agree as a general proposition that time is of the essence in treating individuals with bacterial meningitis?" Plaintiff suggested that the reason for this statement was to challenge the credibility of Dr. Dajani's testimony that the defendants had treated Ericca, in plaintiff's words, in "exemplary fashion." The court ruled that the statement involved the standard of care and that, under the previous rulings, plaintiff could not ask that question.[10] This was the last time the delay issue arose.

---

[9] Counsel for the defendant pediatricians objected because she believed the court's instructions allowed the jury to consider an unpleaded variation on the timeliness theme. All counsel agreed, however, that the instruction accurately portrayed plaintiff's theory of the case with respect to timing.

[10] As if to highlight the sharp contrast between causation evidence and standard of care evidence, plaintiff had just elicited causation testimony from Dr. Dajani four questions earlier. Plaintiff asked:

Q. With respect to [the] concept of treatment of bacterial meningitis, is it not a well recognized principal [sic] that the longer one goes without appropriate treatment the greater the likelihood of sequela?

A. I think that's generally adhered to principal [sic] which I think is correct.

Upon the conclusion of testimony, the jury was instructed to consider which medication ought to have been given and found that the pediatricians had committed malpractice.[11] It decided, however, that the malpractice had not been the proximate cause of Ericca's injuries. The jury also decided that St. John Hospital had committed no malpractice.

Plaintiff then appealed in the Court of Appeals, raising three issues. The exclusion of plaintiff's delay theory was one of them. In an unpublished opinion per curiam, the Court of Appeals affirmed the trial court's ruling because it believed alleging "appropriate treatment" did not put defendants on reasonable notice of the delay theory. We granted leave to appeal limited to the question whether plaintiff's delay theory was properly excluded. 437 Mich 1047 (1991).

## III

This case presents three issues.[12] The first is whether the trial court's determination that plaintiff failed to comply with MCR 2.111 by failing to

This testimony offers the causation evidence plaintiff and the dissent claim the court excluded.

[11] As the court summarized plaintiff's theory, " 'It is Plaintiff's claim that it is well-recognized that the longer one goes without appropriate treatment when suffering from bacterial meningitis, the greater the likelihood of complications. It is contended that the delay in administering chloramphenicol until April 30th caused the right-sided hemi-paresis and seizures now present in Ericca. It is contended that these problems are permanent in nature and have rendered her permanently disabled.' "

[12] In her concurrence, Justice BOYLE suggests that we should only consider whether the trial court properly denied plaintiff's attempt to amend the pleadings. The grant order, however, phrases the issue more broadly. It limits review "to the issue whether the trial court erred when it excluded" the delay theory. In our view, this order requires *consideration of the pleading issue* because had the delay theory been pleaded, no amendment would have been necessary.

provide reasonable notice of the delay theory was correct. It was. The pleadings make general, conclusory allegations, which do not provide reasonable notice to the defendants. Such pleadings fail to meet the standard imposed by MCR 2.111 and *Simonelli v Cassidy,* 336 Mich 635; 59 NW2d 28 (1953).

The second issue is whether the trial court's decision denying plaintiff permission to add the new theory to the pleadings was correct. It was. The Michigan Court Rules clearly indicate that amendments of pleadings offered during trial should be rejected unless plaintiff affirmatively establishes that defendants would not be prejudiced. MCR 2.118(C)(2). Plaintiff neither made nor asked to make this showing.

The last issue is whether the trial court applied its decision correctly. It did. The court firmly and correctly denied plaintiff the opportunity to offer standard of care evidence respecting the unpleaded liability theory, but also made it clear that plaintiff could present evidence detailing how leaving Ericca essentially unmedicated for roughly a full day after she was hospitalized without what plaintiffs contended was the appropriate drug may have harmed her.[13] Plaintiff has simply failed to show an abuse of discretion.

A

Decisions concerning the meaning and scope of pleadings fall within the sound discretion of the trial court. Consequently, we only reverse when the court has abused that discretion. *Simonelli v Cassidy, supra* at 641, quoting *Grant v Nat'l Manufacturer & Plating Co,* 258 Mich 453; 243 NW 21 (1932). Establishing such an abuse is difficult. As

---

[13] See part D.

this Court has stated, an abuse of discretion will be found when the decision is "so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias." *Spalding v Spalding*, 355 Mich 382, 384-385; 94 NW2d 810 (1959). With this standard in mind, we turn to review the decisions at issue in this appeal.

B

A complaint must provide reasonable notice to opposing parties. MCR 2.111(B)(1); *Simonelli, supra; Jean v Hall*, 364 Mich 434; 111 NW2d 111 (1961); *Scott v Cleveland*, 360 Mich 322; 103 NW2d 631 (1960). This rule is designed to avoid two opposite, but equivalent, evils. At one extreme lies the straightjacket of ancient forms of action. Courts would summarily dismiss suits when plaintiffs could not fit the facts into these abstract conceptual packages. At the other extreme lies ambiguous and uninformative pleading. Leaving a defendant to guess upon what grounds plaintiff believes recovery is justified violates basic notions of fair play and substantial justice. Extreme formalism and extreme ambiguity interfere equivalently with the ability of the judicial system to resolve a dispute on the merits.[14] The former leads to dismissal of potentially meritorious claims while the latter undermines a defendant's opportunity to present a defense. *Jean* and *Scott, supra.* Neither is acceptable.

In this case, plaintiff's allegation that the defendant pediatricians did not provide "appropriate treatment and/or medication in appropriate dos-

[14] *Clements v Constantine,* 344 Mich 446; 73 NW2d 889 (1955).

age and/or duration" does not introduce any issue into the case. To assert a theory of liability, MCR 2.111(B)(1) specifies that an allegation must "state[ ] . . . the facts, without repetition, on which pleader relies," and state "the specific allegations necessary reasonably to inform the adverse party" of the pleader's claims.[15] This allegation fails on both counts. First, it does not refer either specifically or generally to any facts. The first several paragraphs of plaintiff's complaint set out in detail the underlying facts of the lawsuit. This allegation, unlike the others, gives no hint of the facts to which it refers. Without this, the allegation cannot be proper under the court rule.[16] Second, the generality of the allegation defies definition. It delineates nothing specific about how the pediatricians erred. By literally alleging everything, this allegation alleges nothing. Allegations such as this do not provide reasonable notice to defendants and are not proper under MCR 2.111.

In response to the trial court's ruling, plaintiff argued, not that the complaint alleges the delay theory, but that the theory actually pleaded, failure to select an effective antibiotic, included the delay in the initial administration of antibiotics theory. Plaintiff's other argument, raised before this Court, is that *Simonelli v Cassidy, supra,* a case requiring that plaintiffs provide reasonable notice to defendants, is obsolete and anachronistic and ought not to be followed. Neither argument is persuasive.

Plaintiff's complaint does allege that Ericca should have received chloramphenicol instead of

[15] At the time the complaint was drafted, GCR 1963, 111.1(1) governed the sufficiency of the allegations. It is, in all material respects, equivalent to MCR 2.111(B)(1).

[16] Of course, those drafting pleadings can use any concise, organized presentation they choose as long as it meets the substantive requirements of MCR 2.111.

ampicillin.[17] The failure to provide chloramphenicol, plaintiff contended, left Ericca essentially unmedicated for roughly twenty-four hours after entering the hospital. Lacking effective medication for this period, plaintiff suggested, led to the neurological damage Ericca suffered. This theory is distinct from the new theory advanced on the third day of trial. That theory suggested that the failure to initiate medication before 3:40 P.M. on April 29, 1974, caused harm to Ericca. The difference between these theories is subtle, but vast. The first criticizes the choice to use ampicillin. The second criticizes the failure to do anything between 2:40 P.M. and 6:00 P.M. on April 29, 1974.

The basis for plaintiff's argument that, despite the difference, the latter breach of the standard of care was pleaded hinges on the temporal overlap in the proximate cause element of both theories. In the first theory, plaintiff sought to recover for harm Ericca may have suffered because she received chloramphenicol nearly twenty-four hours after entering the hospital. In the second, the unpleaded theory, plaintiff sought to recover for harm Ericca may have suffered because she did not receive medication for the first three and one-half hours in the hospital. These are distinct sources of harm. Plaintiff pleaded the failure to administer chloramphenicol as a theory of recovery but did not plead the delay theory. The trial

[17] Plaintiff did not specify in the complaint that chloramphenicol was the antibiotic to be used. He did, however, detail specifically why ampicillin was the wrong drug to select. Because all parties knew that chloramphenicol was effective, failure to select effective medication became failure to select chloramphenicol over the course of discovery. Ultimately, focusing on whether the theory should be called "failure to select chloramphenicol" or something else beclouds the essential point. Plaintiff did provide notice of the failure to select correct medicine theory through the complaint, but did not provide notice of the delay theory. Without such notice, exclusion of the delay theory was proper.

court thus did not abuse its discretion in distinguishing between these theories and in excluding plaintiff's delay in the initiation of therapy theory.

To extricate himself from the difficulties caused by his failure to plead the delay in the initial administration of antibiotics, plaintiff suggests that this Court ought to abandon *Simonelli, supra,* a case requiring that medical malpractice defendants be provided with reasonable notice of the claims against them.

In *Simonelli,* this Court affirmed a lower court's dismissal of a complaint for failure to state a claim. The question we considered was whether the complaint before us provided sufficient facts to support a cause of action. This Court held that it did not. As we wrote, "Plaintiff has alleged negligence in failing to diagnose an undefined malady and in failing to take proper precautions to prevent injury during the course of the operation, but we find only one specific factual statement. . . . We do not believe that such allegations constitute a sufficient statement of facts to establish a cause of action." *Simonelli, supra* at 643. Although decided in the context of a medical malpractice action, the *Simonelli* Court applied general principles of pleading. Illustrative is the Court's reliance on cases such as *Creen v Michigan Central R Co,* 168 Mich 104; 133 NW 956 (1911), which indicated: " 'When a declaration fails to advise the defendant with reasonable certainty, according to the circumstances of the case, of the facts upon which plaintiff proposes to rely, and will seek to prove it, it cannot be sustained.' " *Simonelli, supra* at 644. Because *Simonelli* hinged on the importance of fair notice to the defendant and not some proce-

dural quirk of 1950's civil practice,[18] its lesson is neither obsolete nor anachronistic and is one we will continue to follow.

Paragraph 10(a)(7) of plaintiff's complaint alleges that the family pediatricians failed to provide "appropriate treatment and/or medication in appropriate dosage and/or duration." Because plaintiff's complaint reveals no factual support for this allegation, as required both by MCR 2.111(B)(1) and *Simonelli*, we decide that plaintiff did not plead the delay in the initial administration of antibiotics theory. This decision, however, does not resolve this appeal. In addition to arguing vociferously that he had, in fact, pleaded the delay in medication theory, plaintiff asked in the alternative to amend his complaint to include it. The trial court denied this request, and we now discuss this decision.

C

MCR 2.118 governs the amendment of pleadings. Specifically, MCR 2.118(C)(2) establishes strict requirements for amending a pleading during trial. Unless the party requesting amendment "satisfies the court that . . . amendment . . . would not prejudice the objecting party," amendment "shall not be allowed." This rule contrasts sharply with the free amendment allowed before trial. *Ben P Fyke & Sons v Gunter Co*, 390 Mich 649; 213 NW2d 134 (1973). Because plaintiff neither made this showing nor asked to make it, we find that the trial court correctly denied plaintiff permission to amend.

---

[18] This Court's attitude toward procedural formality during that era is best illustrated by our statement in *Clements*, n 14 *supra* at 452 "all procedure is merely a methodical means whereby the court reaches out to restore rights and remedy wrongs; it must never become more important than the purpose it seeks to accomplish."

Plaintiff challenges this conclusion in two ways. First, he argues that defendants could not be prejudiced within the meaning of the court rule because they had notice of the allegation. Second, he points to several references to a "special record" made by trial counsel and suggests that we construe one of these as a request to make the showing MCR 2.118(C)(2) requires.

With regard to plaintiff's first argument, the trial court correctly ruled that plaintiff had not provided reasonable notice to the defendants and that amendment would cause prejudicial surprise. This Court has long condemned the use of amendments at trial as a means of surprising defendants. *Scott, supra.* If defendants have been given reasonable notice, from whatever source, that plaintiff intended to assert the claim at trial, no prejudicial surprise within the meaning of MCR 2.118(C)(2) can occur.[19] Because the plaintiff did not provide reasonable notice in this case,[20] amendment would

[19] In this case, defendants contended the amendment would cause them prejudice in a number of ways. First, defendants indicated they would have had to investigate St. John Hospital's practice twelve years before the trial. Second, they would have had to depose several witnesses whose testimony was not relevant to the choice of medication theory. Finally, defendants suggested that they would have had to track down records ranging from medication charts to bills for services. Plaintiff made no showing that these claims of prejudice were unfounded.

[20] In dissent, Justice LEVIN asserts that the defendants had notice of the delay theory through discovery. However, reviewing the discovery materials included in the record indicates that this claim is unfounded. Justice LEVIN quotes several portions of Dr. Thoman's deposition testimony to indicate that defendants had notice of the delay theory. See dissent appendix A. Each of these examples, however, refers to which medicine should have been chosen. Neither indicates that plaintiff might be raising a delay theory.

Additionally, the dissent suggests that plaintiff put defendants on notice of the delay theory because they did not move for a more definite statement and were able to file an answer to a different theory. This suggestion overlooks the fact that the complaint did provide notice of the incorrect medication theory. Seen in this light, defendants' preparation to defend the only theory pleaded is wholly reasonable and cannot be made the basis for inferring notice of an

clearly have caused prejudicial surprise. Simply put, plaintiff may not rely on a facially insufficient allegation, which necessitated the amendment, to alleviate prejudicial surprise caused by the amendment.

Other than claiming that defendants had notice of his new theory, plaintiff points to trial counsel's references to making a special record. None refer, however, to making the showing required by MCR 2.118(C)(2). The first request came right after the trial court's initial ruling that defendants had not been given reasonable notice of the delay theory. Plaintiff's counsel asked simply to make a record showing the information plaintiff's expert witness relied upon in forming his opinions with respect to the care given Ericca Dacon. This request had nothing to do with showing that the amendment would not prejudice defendants.

The only other request to make a special record came during plaintiff's cross-examination of defendant's expert witness, Dr. Adnan Dajani. Dr. Dajani had expressed an opinion that the pediatricians had treated Ericca appropriately. Plaintiff sought to impeach this opinion by focusing on the delay in initiating antibiotic therapy. The trial court ruled this line of cross-examination inadmissible. After this, plaintiff sought to make a special record, apparently to show that antibiotics should have begun within an hour of admission. Again,

unpleaded theory. Furthermore, motions for a more definite statement and other procedural devices for clarifying pleadings would not have produced notice of the delay theory. Plaintiff's counsel discovered the factual basis for the delay theory three days before trial began. Lacking a factual basis for the theory prevents a party from signing a pleading asserting it under MCR 2.114. Thus, if at any time prior to three days before trial defendants moved for a more definite statement, plaintiff would have responded with the incorrect medication theory. Defendants' choice not to move for a more definite statement does not support an inference that they possessed notice of the delay in medication theory.

this request had nothing to do with any attempt to amend his complaint and was not even remotely connected with showing absence of prejudice as required by MCR 2.118(C)(2). Without such a showing, a request to amend "shall not" be granted. The plaintiff failed to meet the burden imposed by MCR 2.118(C)(2). The trial court's denial of permission to amend was therefore correct.

D

The remaining issue is whether the trial court applied its decision correctly. As discussed above, plaintiff argued that the failure to initiate effective antibiotic therapy promptly increased Ericca's chances for permanent complications. On appeal, plaintiff suggests that the trial court excluded vital evidence relating to this theory. Our review of the record reveals that the trial court handled this difficult matter precisely and evenhandedly. Carefully distinguishing between standard of care evidence concerning the hour at which antibiotic therapy should begin and causation evidence linking the chances of permanent complications to lack of effective medication, the court excluded only such evidence that described the standard of care as it related to *what hour* treatment should have started. Evidence concerning the relationship of untreated bacterial meningitis and Ericca's complications was fully admissible and was received without objection. We find no error.

Plaintiff assigns as error the trial court's exclusion of causation evidence. Plaintiff, however, could and *did* introduce evidence tending to show how the alleged failure to medicate with an effective antibiotic the first day, April 29, 1974, led to Ericca's complications. In fact, every medical witness testified in support of plaintiff's theory. The

first evidence relating to the harm Ericca suffered came from Dr. Mark Thoman, plaintiff's expert. He testified that the failure of the defendant physicians to arrest the disease process was a cause of Ericca's complications. After expressing the opinion that unacceptable medical practice caused Ericca's injuries, Dr. Thoman testified:

Taking the whole time period, is that she had been treated with antibiotics, the erythromycin which was the Ilosone, and then penicillin injection and penicillin orally, Ampicillin; these were all in the same family except for Ilosone, within the same family of antibiotics and she continued to have symptoms, so she was not getting well under the drugs that were given in that family. And with that, she went in and was given the same drug. And in my opinion, if it was a different family as I said, that would have been appropriate, or if that drug had been used, it should have been supplemented with other drugs that would have been more effective.

The theory, simply, was that Ericca would have improved with different antibiotics and that stopping the disease earlier would have prevented her complications. Dr. Kim agreed with Dr. Thoman in this regard. He indicated that the complications resulted from Ericca's meningitis.

Q. Do you have an opinion, Dr. Kim, based on reasonable medical probability, as to whether or not the seizures and the right sided hemiparesis were caused as a result of the complication of the bacterial meningitis on April, 1974?
A. I think she has complications from the meningitis and got seizure and paralysis.

After eliciting this testimony, plaintiff moved on to another topic of examination. Dr. Thoman and

Dr. Kim provided the testimony supporting the first element of plaintiff's causation theory: Ericca's untreated meningitis caused her complications.

Dr. Lee and defendant's expert, Dr. Adnan Dajani, testified regarding the second element. Both doctors said that the longer a patient goes without appropriate antibiotic treatment, the greater the likelihood that complications such as Ericca's would occur. While cross-examining Dr. Lee, plaintiff first established that the standard of care required appropriate antibiotics. Two questions designed to link that breach of the standard of care to the harm Ericca suffered followed:

> *Q.* Do you have an opinion, based on reasonable medical probability, as to whether the seizures and the right hemiperises [sic] suffered by Erica [sic] Dacon at the time of the hospitalization in question, occurred as a communication of the meningitis experienced by the child?
> *A.* Yes.
> *Q.* Would you agree that based upon reasonable medical probability, that the longer a child goes without appropriate medical treatment such as inaccurate antibiotic therapy or inappropriate antibiotic therapy, that the greater the likelihood of a sequella [sic] to a condition of meningitis?
> *A.* Yes.
> *Mr. Bleakley:* That's [sic] completes the cross-examination, Your Honor.

Plaintiff elicited similar testimony from Dr. Dajani.

> *Q.* With respect to [the] concept of treatment of bacterial meningitis, is it not a well-recognized principle that the longer one goes without appropriate treatment the greater the likelihood of sequela?
> *A.* I think that is a generally adhered to principle which I think is correct.

Thus, according to Dr. Lee and Dr. Dajani, treating Ericca with the wrong medication on April 29 increased her chances for injury.

Together, Dr. Thoman's, Dr. Lee's, and Dr. Dajani's testimony presented a powerful case on causation to the jury. According to Dr. Thoman, defendant's alleged breach of the standard of care allowed the disease process to continue and, according to Dr. Lee and Dr. Dajani, the longer Ericca suffered from meningitis, the more likely she was to suffer permanent injury.

Although the trial court did not bar plaintiff from introducing evidence showing how the delay in effectively medicating Ericca may have caused harm, the trial court did exclude evidence tending to establish that the standard of care required antibiotic treatment to begin within an hour of diagnosis. Irrelevant evidence, of course, is inadmissible. MRE 402. When evidence does not make a fact "of consequence to the determination of the action more or less probable," it is not relevant. MRE 401. Because plaintiff did not plead that the standard of care was breached with respect to the hour at which treatment should have begun, facts tending to show that the standard of care required treatment at a certain hour were irrelevant. By this reasoning, exclusion of evidence relating the standard of care and the hour at which medication should have been administered would have been proper.

Upon reviewing the excluded statements, it is clear that all relate to the standard of care with respect to the hour that treatment should begin. For example, while examining Dr. Kim, plaintiff asked directly, "Can you indicate, please, what the *standard of care* calls for with respect to mode and timing of therapy?" (Emphasis added.) Plaintiff tried again soon thereafter, "Would you agree that

the *standard of care* for a licensed and practicing physician specializing in pediatrics . . . that the *standard of care* is to promptly administer[ ] appropriate antibiotic treatment?"[21] (Emphasis added.) Because the answer to these questions would not make any fact relevant to the action more or less probable, upon objection, the trial court correctly excluded them.

The result of the trial court's repeated rulings was an exclusion of plaintiff's unpleaded standard of care theory, but admission of plaintiff's causation testimony in its full force. We perceive no abuse of discretion in either. We conclude the trial court properly applied its decision that plaintiff did not plead the delay in the administration of antibiotics as a violation of the standard of care.

IV

This appeal presented three issues. The first was whether plaintiff pleaded the delay in the initial administration of antibiotics theory. Because the complaint provides no factual basis or any specific statement of this theory, we hold that he did not. The second issue is whether plaintiff should have been allowed to amend his complaint to include

---

[21] In dissent, Justice LEVIN provides another example which he contends establishes that the trial court excluded causation evidence. He quotes from plaintiff's question to Dr. Kim asking "whether 'time is of the essence in treating a child suffering from bacterial meningitis?'" *Post,* p 360. The complete quotation, however, makes it clear that the question related to the standard of care for proper treatment and not to any causation theory.

> *Q. With respect to treatment,* Dr. Kim, time is of the essence in treating a child suffering from bacterial meningitis? Is that not true?

Because this question regarding standard of care was asked immediately after the court had ruled such questions inadmissible, the court intervened before Dr. Kim answered.

the delay theory on the third day of trial. Because the court rule governing amendment of pleadings does not authorize such amendments without a showing that defendants would not have been prejudiced, denial of permission to amend was correct. Lastly, plaintiff challenges the trial court's exclusion of proximate cause evidence. Because the court did not exclude causation evidence, we find no error. The judgment of the Court of Appeals is therefore affirmed.

CAVANAGH, C.J., and RILEY and GRIFFIN, JJ., concurred with BRICKLEY, J.

BOYLE, J. Although I concur in the majority's conclusion that the trial court's refusal to permit the plaintiff to amend his pleading was not an abuse of discretion, I write separately because to the extent that the majority's opinion can be read to reaffirm *Simonelli v Cassidy,* 336 Mich 635; 59 NW2d 28 (1953), I disagree.

I

The sole issue presented in this case is whether the "trial court erred when it excluded the plaintiff's theory that the defendants were liable for delaying the initial administration of antibiotics." (Order granting leave to appeal.) 437 Mich 1047 (1991). The answer to that question requires an interpretation of MCR 2.118(C)(2), the rule governing amendments of pleading during trial.[1]

---

[1] MCR 2.118(C)(2) provides:

> If evidence is objected to at trial on the ground that it is not within the issues raised by the pleadings, amendment to conform to that proof shall not be allowed unless the party seeking to amend satisfies the court that the amendment and the admission of the evidence would not prejudice the objecting party in maintaining his or her action or defense on the merits.

In answering the question before the Court, there is no need to opine on the question of *Simonelli v Cassidy, supra,* because the question is not whether the complaint should be dismissed for lack of specificity; the question is whether the trial court erred in refusing to allow an amendment during trial.

The majority correctly rules that it was not an abuse of discretion for the trial court to conclude 1) that the theory set forth in plaintiff's complaint and upon which the parties proceeded to trial was that the defendants failed to diagnose ampicillin-resistant meningitis, and 2) that this theory differed from that raised during trial. That being said, it is unnecessary to reaffirm *Simonelli,* a case decided prior to the adoption of the General Court Rules of 1963, which liberalized the pleading requirements.[2]

In this case, the Court is not confined to an analysis of the complaint and the amendment because it is analyzing the trial court's exercise of discretion after trial commenced. The initial complaint failed to set forth facts regarding a delay in treatment after diagnosis. Despite requests for specific facts supporting allegations of a failure to provide appropriate treatment in interrogatories, plaintiff failed to provide answers that sharpened the issues sufficiently to provide adequate notice in advance of trial that a theory to be presented at trial was a delay in the administration of medica-

The court may grant an adjournment to enable the objecting party to meet the evidence.

[2] Honigman and Hawkins observe that GCR 1963, 111, the predecessor of MCR 2.111, which is substantially similar, liberalized the requirement that facts be pleaded "to the extent that no pleading shall be deemed insufficient if it reasonably informs the adverse party of the nature of the cause he is called upon to defend." Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), Committee Notes to Rule 111, p 191.

tion upon diagnosis of meningitis. Moreover, plaintiff's mediation summary and opening statement at trial continued to focus on the failure to treat for ampicillin-resistant meningitis. It is within this context that the trial court considered whether to grant plaintiff the right to amend his complaint on the third day of trial.

To be sure, the complexity of medical malpractice litigation may demand more in the way of fair notice than a slip and fall. The answer to the question whether adequate notice has been given depends on when it is asked. To state the obvious, plaintiff's theory might have been adequate when it was filed, but it was not adequate notice of the theory advanced at trial. Motion practice, discovery, mediation, and the considerable management authority of the trial court insure that, in all but the rarest instances, the parties to civil litigation know what the issues are to be tried and how they will try them. In that rare case—this one—the trial court has broad authority to prevent belated blindsiding by either party. It has not been demonstrated that there is a necessity to breathe new life into *Simonelli.* Most importantly, in my view, it is unwise to add ammunition to the war of attrition that the discovery process can all too easily become.

LEVIN, J. (*dissenting*). The majority concludes that the circuit judge properly refused to allow Ericca Dacon to introduce expert testimony that Drs. Mon K. Kim and Thomas E. Lee violated the standard of care when they failed to direct that appropriate medication be administered to her *within one hour* following her admission to St. John Hospital on a diagnosis of suspected bacterial meningitis. The majority so concludes "[b]ecause plaintiff did not plead that the standard of care was breached *with respect to the hour* at which

treatment should have begun . . . ."[1] (Emphasis added.)

The majority ignores that while Ericca did not so plead, Drs. Kim and Lee and St. John Hospital learned, in May, 1985, when the deposition of Ericca's expert witness, Dr. Mark Thoman, was taken, over a year before the trial, that Ericca would offer expert testimony that the standard of care required that appropriate medication—"*multiple* antibiotics;" chloramphenicol or other medication in addition to the ampicillin that was administered—be administered within one hour after Ericca was admitted to the hospital. Dr. Thoman testified on deposition:

> That's why I say multiple antibiotics are started initially. *Ideally, within the first hour after the patient presents to the hospital.* At that time spinal tap is done, history, and physical gram stain, lab tests are ordered, and antibiotics are started *within that first hour.* [Emphasis added.]

---

[1] The majority states:

Because plaintiff did not plead that the standard of care was breached with respect to the hour at which treatment should have begun, facts tending to show that the standard of care required treatment at a certain hour were irrelevant. By this reasoning, exclusion of evidence relating [to] the standard of care and the hour at which medication should have been administered would have been proper. [*Ante,* p 339.]

The court made it clear that only standard of care evidence regarding the hour at which antibiotics should have begun was inadmissible. [*Id.,* pp 324-325.]

After this, plaintiff sought to make a special record, apparently to show that antibiotics should have begun within an hour of admission. [*Id.,* p 335.]

[T]he court excluded only such evidence that described the standard of care as it related to *what hour* treatment should have started. [*Id.,* p 336. Emphasis in original.]

Dr. Thoman also testified on deposition that chloramphenicol and other medications, not ampicillin alone, should have been administered "[o]n admission" to the hospital.[2] Dr. Thoman added: "Usually when you have a meningitis and you get cloudy fluid, you make the fastest diagnosis possible. *You pull out all the stops and start the antibiotics together . . . .*" (Emphasis added.)

In precluding Ericca from introducing expert testimony that "time is of the essence" in treating a child suffering from bacterial meningitis, the majority ignores that Ericca's mediation statement stated that "time is of the essence in initiating appropriate antibiotic therapy in the treatment of meningitis."[3]

Chloramphenicol was administered to Ericca, in addition to ampicillin, twenty-four hours after she was admitted to St. John, and saved her life, but left her with the sequelae, right-sided hemiparesis and seizures.[4] Since chloramphenicol was eventually administered to Ericca and arrested the progress of the disease, the "timeliness" of the administration of chloramphenicol was necessarily an issue, and defendants were necessarily on notice that timeliness was an issue.

I

The judge ruled that choice of medicine—chlo-

---

[2] *Q.* Doctor, I want you to tell me what antibiotics you would have ordered on Erica [sic] Dacon at this point in time.

*Mr. Bleakley* [Ericca's lawyer]: At this point in time meaning April 29th [the date Ericca was admitted to St. John Hospital]?

*Mr. Roth* [hospital's lawyer]: April 29th, 1974.

*Mr. Bleakley:* On admission?

*Mr. Roth:* Right.

[3] Mediation summary dated March 12, 1985, over one year before the trial in August, 1986.

[4] Dr. Thoman testified on deposition that administering chloramphenicol twenty-four hours after admission was "too late."

ramphenicol or ampicillin—but not timing, was an issue in the case stating: "You may talk about the correct medication, the proper medication, but you may not get into timeliness."

The judge was apparently under the impression that "choice of medicine," but not timeliness of administration of correct medicine,[5] was the only issue pleaded. The majority proceeds on the same erroneous premise in stating: "Plaintiff's complaint does allege that Ericca should have received chloramphenicol instead of ampicillin."[6] In actuality, the complaint made no specific allegation concerning the administration of chloramphenicol, or concerning timing or delay.

The complaint stated with some specificity why ampicillin was incorrect medication, *but did not spell out what would have constituted correct therapy.* It stated generally, I agree, that a pediatrician presented with a patient exhibiting the signs, symptoms, and history demonstrated by Ericca "had a duty to administer *appropriate treatment and/or medication* in appropriate dosage and/or duration." (Emphasis added.)

The complaint thus did not, indeed, particularize, except in general terms, that timing and delay was an issue. But neither did it particularize, except in general terms, that choice of medicine was an issue. Whatever may have been the deficiencies in pleading, one cannot properly differentiate in that regard between the pleading of choice of medicine as an issue and the pleading of timing and delay in administering medicine as an issue. The pleading as to one issue suffers from the same deficiency as the pleading of the other.

[5] Chloramphenicol, the medication that Ericca claimed should have been administered on her admission to the hospital, not twenty-four hours later.

[6] *Ante,* pp 330-331.

Nor does the word chloramphenicol appear in Ericca's mediation summary, dated March 21, 1985, which again stated generally that "Eric[c]a was not provided with *appropriate antibiotic therapy.* Instead, she was prescribed Ampicillin; a drug the Defendant doctors knew or should have known, would be ineffective in treating Eric[c]a's meningitis."

The mediation statement was actually more specific regarding timing than choice of medicine in that it stated that "*the longer a child with meningitis goes without appropriate antibiotic therapy,* the greater the *potential for central nervous system complications*," and "*time is of the essence* in initiating appropriate antibiotic therapy in the treatment of meningitis." (Emphasis added.)

The defendants did not have notice of the specifics of Ericca's criticism of the therapy until Dr. Thoman's deposition was taken by the defendants' lawyers. They then learned about the claimed errors in both choice of medicine and in timing in the administration of, and the importance of avoiding delay in, medication.

Since the source of the notice to the defendants of the specifics of Ericca's claim concerning choice of medicine was Dr. Thoman's testimony on deposition, and, in the very same deposition, he testified concerning the importance of timing and avoiding delay in administering correct medication —chloramphenicol, not ampicillin alone—it is, I believe, unfathomable how one could conclude that the defendants were on notice that choice of medicine—chloramphenicol, or ampicillin alone—was an issue, but were not on notice that timing and avoidance of delay in administering correct medication[7] was an issue. The conclusion that the

---

[7] Chloramphenicol, Ericca claimed.

defendants were not on notice that timing and avoidance of delay in administering correct medication was an issue is especially difficult to understand under the circumstance that chloramphenicol was eventually administered.

The same good judgment that persuades the majority to read "appropriate treatment and/or medication in appropriate dosage and/or duration" (the language of the complaint) as including "failure to select an *effective* antibiotic"[8] (emphasis added), should enlighten it to read those words as including "failure to select an effective antibiotic *timely* administered." Surely, "timely administration" would include timely "initial" administration as well as timely "subsequent" administration.

II

*Simonelli v Cassidy,* 336 Mich 635; 59 NW2d 28 (1953), is distinguishable because in that case the defendant physician was not on notice before the trial of the omissions claimed to constitute malpractice. *Simonelli* was decided before discovery depositions of an opponent's expert witness were generally available and taken, and before parties exchanged mediation statements.

A

The defendant physicians and hospital served on Ericca interrogatories asking that she set forth specifically what was meant by "appropriate treat-

---

[8] The majority states:

> In response to the trial court's ruling, plaintiff argued, not that the complaint alleges the delay theory, but that *the theory actually pleaded, failure to select an effective antibiotic,* included the delay in the initial administration of antibiotics theory. [*Ante,* p 330. Emphasis added.]

ment and/or medication in appropriate dosages and/or duration." Ericca responded that the inquiry called for expert testimony, that discovery had not progressed to the point where expert witnesses could be identified, and that after expert witnesses had been "selected for purposes of testifying," she would "further timely supplement answers to these Interrogatories."

Although the defendant hospital moved to require Ericca to respond to certain interrogatories and obtained an order directing her to do so, the defendants did not seek to compel her to supplement the answers as she had promised, and she did not do so.

The majority's recitation is incomplete. While the majority stresses the ambiguity of Ericca's pleading, and her failure to supplement her answers to the interrogatories, it does not consider, as part of the crucible, that Dr. Thoman's one hundred seventy-page deposition was taken on May 21, 1985, over a year before the trial, or the defendants' failure to seek an order directing Ericca to supplement her answers to the interrogatories or directing her to file a more definite statement.

It does not appear why the defendants did not move to compel Ericca to keep her promise to supplement her answers to the interrogatories. The likely explanation is that defendants recognized that little was to be gained by requiring a fuller answer to the interrogatories under the circumstance that defendants had taken a lengthy deposition of Dr. Thoman. They may well have concluded that the one hundred seventy-page deposition made superfluous filing a supplemental answer to the interrogatories, and that the judge would also have so concluded had they made such a motion.

B

The majority's generalizations regarding the need to provide defendants with adequate notice of the specifics of Ericca's claim so that they would have a full and fair opportunity to present a defense on the merits are obviously indisputable. The court rules do indeed provide for fact-specific pleading. But they also provide that a defendant may move for a more definite statement before filing a responsive pleading if the defendant claims that the pleading is so vague or ambiguous that it fails to comply with the requirements of the rules.[9]

Both the treating physicians and the hospital filed answers to the complaint. Neither asserted that the complaint failed to contain a statement of the facts with the specific allegations necessary reasonably to inform them of the nature of the claims they were called on to defend. Neither, claiming that the complaint was vague or ambiguous or otherwise failed to comply with the requirements of the rules, moved for a more definite statement either before or following the filing of their answers.

Just as it might be unfair to a defendant to introduce a new issue at the trial, so, too, it is unfair to a plaintiff to ignore the actual notice of plaintiff's claims that the defendant has received in discovery depositions, answers to interrogato-

---

[9] The court rules provide that a complaint must contain a "statement of the facts" on which the pleader relies in stating a cause of action "with the specific allegations necessary reasonably to inform the adverse party of the nature of the claims the adverse party is called on to defend . . . ." MCR 2.111(B)(1).

The court rules also provide that if a pleading is "so vague or ambiguous that it fails to comply with the requirements of these rules, an opposing party may move for a more definite statement before filing a responsive pleading." If the motion for a more definite statement is granted and is not obeyed, the court may strike the pleading. MCR 2.115(A).

ries, mediation statements, or other documents
filed before the trial.

One needs only to examine the excerpts from
the deposition testimony of Dr. Thoman set forth
in appendix A, to see that greater detail regarding
the specifics of Ericca's claim are there set forth
than could possibly be set forth in a pleading that
would not run afoul of the court rule providing
that "[e]ach allegation of a pleading must be clear,
*concise*, and direct."[10]

To deny a plaintiff an opportunity to present
evidence in support of a theory of recovery of
which the defendants have been fully and fairly
notified in discovery depositions, mediation state-
ments, answers to interrogatories, or other docu-
ments filed before the trial simply because the
plaintiff failed to *plead* the specific facts later
developed in the pretrial discovery and other pre-
trial processes, is, in the words of the majority, to
reintroduce "[e]xtreme formalism" tantamount to
"the straightjacket of ancient forms of action."[11]

C

In many cases, particularly a case where expert
testimony is required, the specific facts will be
fully developed[12] only through discovery long after
the complaint has been filed and answered.

If, as the majority opinion appears to require,
specific facts developed in the discovery process
must be fully stated in the complaint to avoid the
peril of exclusion of evidence in support of a
theory of recovery adequately appearing in the

---

[10] MCR 2.111(A)(1). (Emphasis added.)

[11] *Ante*, p 329.

[12] In such a case, this case, the "studied ambiguity," referred to by
the majority (*id.*, p 321) may be unavoidable at the time the com-
plaint is or must be filed, as in a case where the statute of limitations
may bar the action unless it is filed without further delay.

discovery process on deposition or in response to interrogatories, it will become necessary for plaintiffs, after discovery has been completed, to seek to amend their complaints to set forth the specific facts developed in the discovery process.

While this additional paperwork might tidy things up somewhat, it means additional work for lawyers representing plaintiffs and defendants, and more billable hours to be charged to clients. In the hard-fought areas of employment discharge/discrimination, medical malpractice, and product liability, the majority's approach encourages resistance to a motion to amend. And the plaintiff, in preparing the motion to amend his complaint, had better be letter-perfect lest, if something is omitted, defendant claim that the omission constitutes an abandonment of a claim fully developed in the discovery process.

The regime that I am describing, and which the majority opinion seems to call for, is alien to the practice. Bench and bar rely on the discovery process, mediation statements, and status conferences to narrow the issues and flush out whatever ambiguities there might be in the complaint and answer.

D

This case was filed before the Wayne Circuit Court adopted the individual docket system. This case was originally assigned to the docket of a circuit judge other than the judge who tried the case. Four years later, it was spun off to be tried by another circuit judge in August, 1986. The trial judge, thus, was not familiar with the pretrial history of the case, and the knowledge of what the case is about that a judge who decides pretrial motions picks up in deciding such motions.

In this case, it was not the defendants' lawyers, but rather the judge, see appendix B, who raised the question whether delay in treatment had been pleaded. It is clear from the opening statements that, although the defendants' lawyers eagerly exploited the opportunity to undermine Ericca's case presented when the judge raised the timing question, it did not independently occur to them that whatever ambiguity there might have been in the complaint regarding the deficiencies in treatment and medication of Ericca justified the exclusion of evidence developed in the discovery depositions.

I am confident that if Wayne Circuit Court had adopted an individual docket system before this case was filed, the trial judge would not have been in doubt that timing and delay were as much a part of Ericca's claim as choice of medication.

E

The majority needlessly reconsiders *Simonelli*. The mischief that will ensue will take some time to undo. *Simonelli* was decided almost forty years ago. Practitioners have been doing quite well in the interim without another opinion from this Court expounding on *Simonelli*.[13] They will, I expect, with the assistance of trial judges who have no time or patience for empty exercises, find a practical means of obviating, in many cases, the injustice that today's opinion will cause in other cases where the judge is less adept at case management and counsel are entirely adversary in their approach.

---

[13] There have been Court of Appeals opinions. See *O'Toole v Fortino*, 97 Mich App 797; 295 NW2d 867 (1980), *Bryson v Stone*, 33 Mich App 512; 190 NW2d 336 (1971), *Haase v DePree*, 3 Mich App 337; 142 NW2d 486 (1966), *Hill v Freeman*, 117 Mich App 788; 324 NW2d 504 (1982), and *Martinez v Redford Community Hosp*, 148 Mich App 221; 384 NW2d 134 (1986).

F

To be sure, Ericca's lawyer did move, after the judge's adverse rulings at the trial, to amend her complaint after the judge ruled that her complaint was deficient, under *Simonelli*, because there was "no allegation as to a delayed treatment." It does not follow that there was any need to move, during the trial, to amend, and thus it does not follow that there is any need for this Court to consider either *Simonelli* or whether the motion to amend should have been granted.

In this case, a central issue, we all agree, is whether the judge erred in barring the introduction of evidence that appropriate medication should have been administered to Ericca within one hour of her admission to St. John Hospital. Because the defendants were fully and adequately informed, by Ericca's mediation statement and Dr. Thoman's one hundred seventy-page deposition, that her theory was that Drs. Kim and Lee violated the standard of care in failing to administer correct medication—chloramphenicol in addition to ampicillin—within one hour of her admission to St. John Hospital because time is of the essence in treating a child with bacterial meningitis, her failure to seek, before the trial, to amend her complaint to so state does not justify excluding expert testimony supportive of her theory.

There is thus, in my opinion, no need to reconsider *Simonelli*, concerning specificity in fact pleading, or whether the motion during the trial to amend the complaint should have been granted.

III

As set forth in the majority opinion, Ericca was examined in Dr. Kim's office on the morning of

April 29, the day she was admitted to the hospital. Dr. Kim did not observe symptoms of meningitis until, as he was about to send Ericca home with a relatively "ordinary" antibiotic prescription,[14] Ericca's mother mentioned that she cried whenever her neck was pushed forward. So alerted, Dr. Kim recognized that such rigidity was a symptom of meningitis and ordered a complete blood count for Ericca, "stat.," which meant that he wanted the results within the hour. Mrs. Dacon testified that Dr. Kim said that he suspected meningitis.

Within the hour, the blood count came back with a highly elevated white blood cell count. Dr. Kim telephoned Mrs. Dacon to take Ericca to St. John Hospital as soon as possible. She was admitted on a preliminary diagnosis of bacterial meningitis at 2:40 P.M., twenty minutes after Dr. Kim telephoned Mrs. Dacon. An intern or a resident performed a spinal tap before 3:00 P.M., which immediately revealed, on visual examination, "grossly cloudy" spinal fluid.

This was tantamount to confirming meningitis, and, because of the white blood cell count, bacterial meningitis. The fluid was sent to the laboratory for further analysis which would not come back for at least twenty-four hours.

Neither Dr. Kim nor Drs. Transue or Lee, the other doctors in the clinic, visited Ericca on the 29th at the hospital. Orders to administer ampicillin were given by telephone sometime before 6:00 P.M.

When asked at trial why he did not visit Ericca at the hospital on the day she was admitted, Dr. Kim said that the doctors in his medical group changed responsibility weekly for making rounds at the three hospitals that the group covered, and

[14] Pediamycin.

that, during the week of April 29, 1974, it had been one of the other doctor's turn.

When Ericca was visited by Dr. Lee the following day and he observed her condition, he ordered another spinal tap and that chloramphenicol be added to the ampicillin started the day before—the multiple therapy that Ericca's expert witness claimed was the standard of care. Ericca was medicated with chloramphenicol between 2:30 and 3:00 P.M. on April 30—twenty-four hours after she was admitted—and thereafter until the meningitis was repressed.

IV

The majority states that Ericca's lawyer advanced a new theory on the third day of trial. The "new" theory suggested—for the first time, says the majority—that the failure to initiate medication before 3:40 P.M. on April 29, 1974 (one hour after Ericca's admission to St. John Hospital) caused harm to Ericca. The majority states that this new, "unpleaded" theory, "criticizes the failure to do anything between 2:40 P.M. and 6:00 P.M. on April 29, 1974."[15] The asserted delay in advancing this theory is attributed to Ericca's lawyer's misreading Ericca's medication chart as stating 1500 (3:00 P.M.) when it actually stated 1800 (6:00 P.M.).

The majority states that Ericca sought to recover under her first theory—deemed by the majority to have been "pleaded"[16]—for harm suffered because she did not receive chloramphenicol until nearly twenty-four hours after entering the hospital, and under her second, "unpleaded" theory, for harm suffered because she did not receive medica-

[15] *Ante,* p 331.
[16] Footnote 3 and accompanying text.

tion for the first three and one-half hours in the hospital.[17]

The majority's recitation of Ericca's first theory omits that part of her first theory was that—because time is of the essence in medicating for bacterial meningitis—chloramphenicol should have been administered within one hour of her admission to the hospital, and that she suffered harm because of the failure to administer chloramphenicol during each of the ensuing twenty-three hours of delay, which included the first two and one-half hours following the first hour after she was admitted to the hospital.

It was of little or no importance whether Ericca's lawyer misread Ericca's medication chart, or "made a startling discovery"[18] when he observed that medication did not begin at 3:00 P.M., but rather commenced at 6:00 P.M., on the day she was admitted to the hospital. Ericca's first theory, completely stated, was that correct medication should have been administered within one hour of her admission to the hospital, whenever she was admitted.

Ericca's one and only theory was that every hour of delay in administering correct medication, chloramphenicol, and other antibiotics rather than ampicillin alone, beyond one hour after admission to the hospital, was a departure from the standard of care.

A

The majority describes Ericca's "new" theory,

[17] *Ante,* pp 331-332.

[18] *Id.,* p 322.

The majority adds: "Plaintiff's counsel kept this information and its implications to himself." *Id.,* p 323.

Since I see little or no importance in the "startling discovery," I am not surprised that Ericca's lawyer did not perceive "implications" requiring some sort of disclosure.

"discovered three days" before the trial, as seeking to recover for harm caused "to Ericca" as a result of "failure to initiate medication before 3:40 P.M. on April 29, 1974 . . . ."[19] The majority states that this, the "new" theory, seeks to recover for the three hours, twenty minutes "failure to do *anything* between 2:40 P.M. and 6:00 P.M. . . . ."

This "new" theory has been described as the "delay in administering ampicillin" theory. It is now recognized that there could not have been such a theory, that Ericca did not seek, nor could she have sought, to recover for harm caused as a result of delay in administering an ineffective drug, ampicillin, unless there was an effective drug, chloramphenicol, that could and should have been administered.[20] Thus, the "new" theory criticizes, not the "failure to do *anything*" between 2:40 P.M. and 6:00 P.M., but rather the failure to administer chloramphenicol before 6:00 P.M. on the 29th or during the ensuing twenty hours, forty minutes—Ericca's "one and only theory." There was no "new" theory.

---

[19] *Ante,* p 331.

[20] Having postulated at the trial that Ericca's lawyer was seeking to recover for delay in administering ampicillin, the physicians' lawyer correctly states on brief in this Court that such a theory would seek to recover on the basis "that the wrong drug was not started at the 'right' time."

Ericca's lawyer in fact advanced no delay in administering ampicillin theory. Ericca's lawyer attempted, without success, to make clear that Ericca was not attempting to *recover* for delay in medicating her with ampicillin:

> There's never been an issue that the inappropriate antibiotics [ampicillin] should have been given.

The judge responded that Ericca's lawyer could not introduce evidence regarding the timeliness of administration of medication—any discussion of timeliness was forbidden.

Timing and timeliness became a "T" word, that, once the defendant's lawyers perceived the direction of the judge's rulings, touched off objections and rulings adverse to Ericca, excluding evidence regarding the timeliness of the administration of *chloramphenicol.*

The majority states that "plaintiff sought to recover for harm Ericca may have suffered because she did not receive medication for the first three and one-half hours in the hospital."[21] As set forth earlier, all agree that the defendants were on notice that Ericca claimed that they had failed to provide an "effective antibiotic."[22] Implicit in such a claim is the claim that an effective antibiotic should have been *timely* administered, *initially* and subsequently. The judge's rulings striking and barring testimony concerning the urgency of timely administration of effective antibiotic therapy not "only" excluded evidence concerning the urgency of avoiding delay in administering antibiotic therapy during the first three and one-half hours Ericca was in the hospital, but *also excluded evidence concerning the urgency of avoiding delay in administering antibiotic therapy during the first twenty-four hours she was in the hospital.*

B

The judge did not confine the exclusion of evidence to evidence bearing on the "short delay"[23]— 3:40 P.M. (one hour after Ericca was admitted at 2:40 P.M.) and 6:00 P.M., when medication with ampicillin was actually commenced. She struck all of Dr. Thoman's trial testimony, including the following testimony admitted without objection sometime before the judge raised the question whether "timeliness" was pleaded:

> If the spinal fluid is cloudy, then that's a very high indication that this is in fact a meningitis and *treatment must begin actually from the time*

[21] *Ante,* p 331.

[22] See n 4 and accompanying text.

[23] *Ante,* p 324.

*you think of meningitis.* The spinal tap, i.v. and antibiotics, everything must begin actually *within an hour after all this transpires.* So once the initial diagnosis is considered, the tests and the medications are started in order to treat that. And generally, and for the last well over two decades since I was an intern, it's been *within an hour* after that's considered the treatment has to begin. [Emphasis added.]

After the judge struck Dr. Thoman's testimony, Ericca's lawyer attempted to ask Dr. Kim, one of the defendant treating physicians, "what the standard of care calls for with respect to mode and timing of therapy," and whether "*time is of the essence* in treating a child suffering from bacterial meningitis?" (Emphasis added.) The judge sustained objections stating that she had "ruled timeliness is not an issue in the case, but you may ask about the mode of treatment that would be proper once the condition is expected."

Ericca's lawyer later asked Dr. Kim whether "the standard of care is to promptly administer[ ] appropriate antibiotic treatment." The judge barred the testimony stating: "Promptness, the timeliness, *however you want to express it,* I have ruled is not an issue in the case . . . ."

Ericca's lawyer, still later, directed Dr. Kim's attention to the complaint. When asked the relevance, he stated: "Two points: The appropriate treatment of bacterial meningitis to a medical professional who should not be misunderstood involves two things: Timeliness—," the "T" word. The judge excused the jury and said:

Mr. Bleakley, I'm going to make this statement and I hope you understand it. I have made a ruling, I have repeated that ruling. *I have listened to your ways of trying to get around that ruling.* I

indicate to you now, if you mention timeliness one more time, *I will hold you in contempt of court.* [Emphasis added.]

Ericca's lawyer, nevertheless, sought to be creative in finding another way to present evidence on the importance of timely administration of drug therapy when, in the course of cross-examining Dr. Adnan Dajani, the expert witness for the defendants, he called his attention to his testimony that Drs. Kim and Lee had treated Ericca in "exemplary fashion," and asked whether the witness "would agree as a general proposition that *time is of the essence* in treating individuals with bacterial meningitis." He responded "Yes," but got no further when the lawyer for the hospital objected.

The judge then asked Ericca's lawyer "why did you ask that question?" He responded that he was seeking to challenge the witness' credibility. The judge said: *"What difference does his testimony in this case, or any other case, as to time being of the essence, have to do with the issues in this case?"* The judge added that she would permit questions concerning the administration of ampicillin and chloramphenicol "but not as to the timeliness of it, not as to credibility, *or whatever else you might call it."* The jury was told to disregard the question.

It is thus clear that the judge's rulings, excluding both "time essence" and "within one hour" testimony, excluded evidence concerning the urgency of timely administration of effective antibiotic therapy, not only during the "short" two-three hour, twenty minute delay encompassed by the assertedly "new theory," but also excluded evidence concerning the urgency of timely administration of effective antibiotic therapy during the

ensuing twenty hours and forty minutes between the administration of the ineffective drug, ampicillin, and the effective drug, chloramphenicol.

The effect of the judge's ruling was not limited to two hours and twenty minutes. Her ruling, excluding testimony concerning the urgency of immediate administration of correct therapy, was not limited to the "short delay," two hours and twenty minutes, between 3:40 P.M. and 6:00 P.M. on April 29, but applied as well to the longer delay of approximately twenty-four hours, from 2:40 P.M. on April 29, when Ericca was admitted, to 2:30-3:00 P.M. on April 30 when the therapy was corrected by adding chloramphenicol to the medication. The judge said:

> Let me make it clear. Whether we're talking five minutes, one hour, seven hours, 24 hours or two years, when we talk about time, as far as I'm concerned, we're talking about timeliness.
>
> There is no issue any longer and there never was timeliness in this case.
>
> You may talk about the correct medication, the proper medication, but you may not get into timeliness.
>
> Understood?

C

The majority notes that Dr. Lee and the defendants' expert witness, Dr. Dajani, testified that "the longer a patient goes without appropriate antibiotic treatment, the greater the likelihood that complications such as Ericca's would occur."[24] This testimony was indeed supportive of Ericca's claim that delay in administering appropriate antibiotic therapy caused the sequela that she suffered, right-sided hemiparesis and seizures.

[24] Ante, p 338.

The admission of such testimony does not, however, render harmless striking all the testimony of Ericca's expert witness, Dr. Thoman, concerning the urgency of immediate administration of correct medication, or the exclusion of further testimony from Dr. Thoman regarding the importance of timely administration of correct therapy, or barring cross-examination of defendants' expert witness whether time was of the essence, or other cross-examination of Drs. Dajani, Kim, and Lee concerning the urgency of timely administration of correct medication.

It is apparent from the responses of Drs. Dajani, Kim, and Lee to questions concerning delay in administering correct antibiotics, that had the judge permitted Ericca's lawyer to cross-examine them more specifically whether antibiotics should be commenced within one hour—if not, within how many hours doctor?—and whether time is of the essence, as Dr. Dajani acknowledged before the lawyer for the hospital objected, that Ericca may very well have obtained concessions from the treating physicians and their expert witness that timely treatment is imperative. Statements that the longer a patient goes without appropriate antibiotic treatment, the greater the likelihood that complications will occur, do not convey the same sense of urgency.

Without expert medical testimony, that timely administration of correct therapy is imperative (that time is of the essence), that, as Dr. Thoman testified on deposition, when a spinal tap (made immediately after Ericca was admitted to the hospital) shows a cloudy fluid "you pull out all the stops and start the [multiple] antibiotics together," within the hour of admission, the jury did not have—despite the concession that the longer the patient goes without appropriate antibiotic treat-

ment, the greater the likelihood of complications—all the evidence that it should have had to assess whether the twenty-four-hour delay in administering the correct medication, chloramphenicol, may have been responsible for the right-sided hemiparesis and seizures.

D

As set forth in the majority opinion, the jury found that Ericca was improperly medicated, with ampicillin, by Drs. Kim and Lee, but that the delay in administering chloramphenicol—which arrested the progress of the disease and saved her life—until twenty-four hours after her hospitalization was not the proximate cause of the right-sided hemiparesis and seizures.

The majority attempts to draw a distinction between evidence on standard of care and evidence on causation, stating that the judge "made it clear that only standard of care evidence regarding the hour at which antibiotics should have begun was inadmissible," but indicated that Ericca could present "causation evidence linking Ericca's injuries to untreated meningitis."[25]

I have read substantial portions of the transcripts. Neither the judge nor the lawyers for the defendants drew a distinction between evidence on standard of care and evidence concerning causation, although, after the judge had ruled *and plaintiff's proofs had been largely completed,* there was some minimal recognition that causation was an issue. It is unclear on what basis the majority perceives that the judge "indicated," when she ruled, that Ericca could present causation evidence.

In all events, the evidence that was stricken,

[25] *Ante,* p 325.

"regarding the hour at which antibiotics should have begun," was probative not only of the standard of care but also on the issue of causation. In excluding such evidence, in striking Dr. Thoman's trial testimony concerning the hour when the administration of antibiotics should have begun, and in barring cross-examination of defendants' expert witness and of defendant treating physicians concerning the hour when the administration of antibiotics should have begun, the judge effectively barred Ericca from introducing probative evidence concerning the issue of causation, evidence that may have persuaded the jury that the twenty-four hour delay in administering chloramphenicol caused the right-sided hemiparesis and seizures.

V

The majority states that on the fifth day of trial the judge instructed the jury as follows:

> " 'The timing as to when the *initial* antibiotic therapy was administered at St. John's [sic] Hospital on April 29, 1974 is not an issue in the case. You may consider, however, the Plaintiff's claim that the *appropriate* antibiotic therapy was not started on April 29, 1974.' "[26] [Emphasis added.]

The majority's reliance on this instruction ignores that the judge during the course of Dr. Thoman's testimony, had instructed the jury that "timeliness of the administration of medication is not going to be an issue in this case," and that the instruction on the fifth day of the trial ("[y]ou may consider" Ericca's "claim that the appropriate antibiotic therapy was not started on April 29") did not

26 *Id.,* p 326.

retract the earlier instruction that "timeliness of the administration of the medication" is not an issue. The majority's reliance on this instruction also ignores that expert testimony concerning the urgency of timely administration of appropriate antibiotic therapy had been stricken and barred.

In agreeing to this instruction, Ericca's lawyer did not thereby agree that the judge had correctly stricken the testimony of Ericca's only expert witness, and had correctly barred further examination of Ericca's expert witness and cross-examination of the defendant treating physicians concerning the urgency of timely treatment. In agreeing to such an instruction—after seemingly endless argumentation concerning the "short" two-three hour, twenty minute delay in administering the ineffective medicine, ampicillin—Ericca's lawyer did not agree that the judge properly excluded evidence concerning *the urgency of avoiding further delay, during the ensuing twenty hours, forty minutes,* in administering an effective drug, chloramphenicol.

In all events, the jury apparently was in doubt after the judge had instructed the jury shortly before it retired to consider its verdict. The jury sent notes inquiring whether timing was an issue. The jury thereby indicated that it did not understand the instructions concerning timing in administering medication.

In responding to the notes from the jury, the judge said:

> I have been trying to convey to you that timing *is an issue in this case only when you distinguish* between April 29th and April 30th. Plaintiff claims that the appropriate antibiotic was not administered—antibiotic, singular or plural—was not administered on April 29th.

I'm saying you may consider that it was not
started until April 30th, if you agree that that
was appropriate to start it on April 30th. That's
the only way that you may consider time in this
case, is when you distinguish between what was
done on the 29th as opposed to what was done on
the 30th or later. And it relates to the administra-
tion of the appropriate antibiotic, *not to the timing
of diagnosis or any other situation.* [Emphasis
added.]

In stating that "the only way that you may
consider time in this case, is when you distinguish
between what was done on the 29th as opposed to
what was done on the 30th or later," the judge
was saying—as appears from colloquy with counsel
before she responded to the jury's notes:

I have to make it clear to the Jury—I have tried
to do so—that the issue of time for administering
the appropriate• treatment *has to be limited to
April 30th* as opposed to April 29th.

The judge thus was saying that timing—and
delay in administering effective medication—could
not be considered until the day after Ericca was
admitted to the hospital. This was more than one
hour, more than two-three hours twenty minutes,
more than nine hours twenty minutes (between
2:40 P.M. April 29 and midnight). What the judge
meant, and the jury may have understood, was
that timing could not be considered until Dr. Lee
appeared on the 30th and actually ordered that
chloramphenicol be added to the antibiotic ther-
apy, in addition to ampicillin.

Clearly, timing and delay on the 29th was an
issue respecting at least whether there was a
causal relationship between the delay from
6:00 P.M. on the 29th until 2:30-3:00 P.M. on the

30th in adding chloramphenicol and the right-sided hemiparesis and seizures suffered by Ericca.

The jury's understandable inability to comprehend what the judge was saying, the thin distinction between choice of medicine and timing of medication, *coupled with the judge's decision to strike the evidence that had been adduced, concerning the importance of timing and avoiding delay, and to bar further evidence respecting timing and delay in administering medication,* may explain the jury's finding that the treating physicians erred in the choice of medicine, but that the error was not the cause of the right-sided hemiparesis and seizures.

## VI

Indisputably, ampicillin was ineffective, and chloramphenicol saved Ericca's life. Clearly, ampicillin was the wrong medicine and chloramphenicol the right medicine without regard to whether there was a departure from the standard of care in choice of medicine—in initially administering ampicillin and in delaying the administration of chloramphenicol until the next day.[27]

Unless the delay in administering chloramphenicol was causally related to the right-sided hemiparesis and seizures, it was of no importance whether medicating Ericca with ampicillin rather than chloramphenicol was a breach of the standard of care. Timing in medicating necessarily was an issue.

The question of choice of medicine and the question of timing and delay in medicating Ericca

---

[27] The factual questions were whether there was a departure from the standard of care in medicating Ericca with the ineffective drug, ampicillin, rather than the effective drug, chloramphenicol, and whether the delay in administering chloramphenicol was causally related to the right-sided hemiparesis and seizures.

were, thus, inextricably interrelated. Timing in medicating, once again, was necessarily an issue.

Entirely apart from whether the defendants were on notice that timing and delay in medicating Ericca was an issue—and the record shows that they were on notice, *and did not claim otherwise until the judge raised the question whether they were on notice*—implicit, as the judge apparently ultimately recognized, and the majority also recognizes, in the issue of choice of medicine is the issue whether effective medicine was timely administered.

The majority appears to recognize that the issues are interrelated when it states that evidence concerning what happens to a person suffering from meningitis who receives the wrong medication "is the proximate cause component" of the "wrong choice of medication" theory.

There was no point in exhaustingly trying at great length (ten trial days) and at great, sometimes tedious, detail every possible aspect of the issue of choice of medicine without also trying—*by allowing Ericca to introduce evidence concerning*—the issue of timing and delay.

Ultimately, the only issue that there could have been in this case—the issue on which the jury found against Ericca, the issue respecting which evidence was stricken and barred—was whether any departure from the standard of care *found by the jury* in choice of medicine, in delaying until the second day of hospitalization the administration of chloramphenicol, the medication that saved Ericca's life, was a cause of the right-sided hemiparesis and seizures.

It was extraordinary to rule, as did the judge, that the issue of choice of medicine should be tried, but—by refusing to allow Ericca to put in evidence respecting timing or delay—to bar her

from effectively trying the issues of standard of care and causation. The defendants assuredly did not concede causation, and the jury, by its verdict, found against Ericca on that very issue.

The judge, in a belated reversal of direction, instructed the jury immediately before it retired to consider its verdict that plaintiff's theory of liability included the contention that the *delay* in administering chloramphenicol until the second day of hospitalization caused the right-sided hemiparesis and seizures[28]—the issue the judge had found, when the expert witnesses and treating physicians were in the witness chair, the physicians and hospital did not have notice of. By then, however, the judge had, in repeated rulings during the trial, excluded evidence respecting timing and delay in administering antibiotics and, thus, evidence tending to support Ericca's claim that the delay in administering chloramphenicol caused the right-sided hemiparesis and seizures.

## VII

At the new trial to which Ericca is entitled, a trial at which her expert witness is permitted to testify respecting timing and the importance of avoiding delay in administering chloramphenicol, and at which her lawyer is permitted to cross-examine the treating physicians and their expert

[28] The judge instructed the jury:

It is Plaintiff's claim that it is well-recognized that the longer one goes without appropriate treatment when suffering from bacterial meningitis, the greater the likelihood of complications. It is contended that the delay in administering chloramphenicol until April 30th caused the right-sided hemiparesis and seizures now present in Ericca. It is contended that these problems are permanent in nature and have rendered her permanently disabled.

witness regarding timing and delay, and at which the jury is instructed that delay in medicating Ericca with chloramphenicol was the theory on which she sought to recover—as this jury was ultimately and belatedly instructed, after evidence supporting the delay-in-administering-*chloramphenicol* theory was stricken and excluded—the jury might again conclude that there was malpractice in failing to administer chloramphenicol and other medication in lieu of ampicillin, and also conclude that such malpractice was the proximate cause of the right-sided hemiparesis and seizures.

I would reverse and remand for a new trial.

Mallett, J., concurred with Levin, J.

### APPENDIX A

The following are excerpts from Dr. Thoman's deposition testimony.

*Q.* What was the treatment of choice by yourself at that time?

*A.* The treatment generally was what we call multiple therapy where we use two or even three antibiotics in substantial dosages. The three antibiotics or the two antibiotics, one antiseptic which was appropriate in the early to mid '70s was Chloromycetin, ampicillin, and sulfa. Gantrisin is one sulfa that was used at the time.

*Q.* Sulfa being the antiseptic?

*A.* That's correct.

*Q.* Is it your testimony that as of April of '74, Chloromycetin could have been the treatment of choice in and of itself?

*A.* Not alone.

\* \* \*

*Q.* You stated that Doctor Gavin or Savin [the intern or resident], whoever signed this order on

April the 29th of ampicillin, that that was inappropriate treatment at that time, is that correct?

*A.* That's correct.

*Q.* And in lieu of that he should have ordered a Cephalosporin or Chloromycetin?

*A.* If that had been ordered, it has to be taken different ways. If ampicillin had, in fact, been started assuming that they never had one in Michigan that ever was resistant to ampicillin, then other antibiotics had to be started at the same time with the ampicillin, which would have included the Chloromycetin and the sulfa, for example.

*Q.* So you're saying it was appropriate to administer ampicillin in this case as long as it was administered along with another antibiotic, such as Cephalosporin or Chloromycetin?

*A.* No. Let me clarify this. If ampicillin had been started, and as I said, my main criticism is that ampicillin and penicillins had been given for two weeks and the child was getting sicker, you don't use the same thing that didn't make the child well.

So if one were to use this in higher dosages, which is a massive dose, much more than the textbook recommends at that time and present, then it would also be imperative that other antibiotics be used or technically antiseptics be used in conjunction with that ampicillin in higher dosages, such as Chloromycetin and sulfa. I'll stop there.

*Mr. Roth:* Could you read that answer back. (The requested portion of the record was read.)

*Q.* Doctor, I want you to tell me what antibiotics you would have ordered on Eric[c]a Dacon at this point in time.

*Mr. Bleakley:* At this point in time meaning April 29th?

*Mr. Roth* [hospital's lawyer]: April 29th, 1974.

*Mr. Bleakley* [Ericca's lawyer]: On admission?

*Mr. Roth:* Right.

*A.* I would have used Chloromycetin intravenously and some type of sulfa preparation, such as Gantrisin.

*Q.* In what dosages?

*A.* The Chloromycetin would range from 100 to 200 milligram per kg. One hundred milligram per kilogram. She was 7.4 kilograms so 750 milligram would have been an appropriate dose.

*Q.* Per . . .

*A.* In a 24-hour period. She's 7.4 kilograms so if you were to go—some would use 200 milligrams per kilogram the first day as a loading dose in the early '70s, which in that case would have been one and a half grams of Chloromycetin.

So if one were to take the average of what we would do 11 years ago, we would use about a gram Chloromycetin particularly the first day along with sulfa.

*Q.* How much sulfa?

*A.* Of the Gantrisin 100 milligrams per kg could be used and that would be essentially 750 milligrams.

*Q.* In a 24-hour period?

*A.* That's correct, iv.

*Q.* What other antibiotic therapy initially at this stage would have been appropriate?

*A.* One could have used penicillin in the penicillin G or the aqueous penicillin, but since she had been on it before one might elect to use some other type of antibiotic, such as Cephalosporin.

*Q.* What are those?

*A.* I don't know whether Kefzol was marketed. Let's say that Cephalosporins Keflex, Kefzol. We're talking about, say, 100 milligrams per kilogram. It would have been the type of dosage that one might give within the first 24 hours. So we're talking about a 7.4 kilogram child. So 750 milligrams.

*Q.* A day again?

*A.* That's correct.

*Q.* That would have been true with the Keflex and Kefzol?

*A.* The Cephalosporins taken as a group. There were several. I don't know when one brand came out. We're in the third generation [of] Cephalosporins now.

*Q.* So it would have been appropriate either to have administered one of the Cephalosporins you have indicated?

*A.* That would have been one option, yes.

*Q.* With what? Anything with the Cephalosporins?

*A.* Yes. You could use the Chloromycetin with the Cephalosporins. The problem is . . .

*Q.* What dosage?

*A.* I had given you that.

*Q.* The same dosage as you told me before?

*A.* That's correct, 100 to 200 milligrams per kg.

*Q.* And the other appropriate mode would have been just the Chloromycetin with the sulfa?

*A.* And one could elect to use ampicillin at 200 milligrams per kg or penicillin, but alone particularly since it hadn't worked before wasn't appropriate in my opinion.

*Q.* If ampicillin was utilized, as in this case, in your opinion it would have had to have been accompanied by what else?

*A.* Sulfa and Chloramphenicol.

*Q.* Sulfa and the Chloromycetin?

*A.* That's correct, the triple therapy. Chloramphenicol and Chloromycetin are interchangeable terms.

\* \* \*

*Q.* Other than the timing of giving it, was it appropriate to give it.

*A.* I thought it was appropriate.

*Q.* Together with the ampicillin, no problem?

*A.* Save for the problems I have already discussed.

*Q.* Well, the problem you discussed at length earlier was ampicillin in and of itself.

*A.* That's correct.

*Q.* Together with the Chloramphenicol, is there any problem?

*A.* The ampicillin with the qualification of the dosage and the sodium we have discussed, if ampicillin had been given, it shouldn't have been given alone. It should have been given with Chloromy-

cetin. My problem here is giving it more than 24 hours after admitting.


### APPENDIX B

The majority errs in stating that when Dr. Thoman testified that "treatment should begin within an hour of diagnosis," "[d]efendants *immediately* objected, arguing that choice of medication, *not delay in making a diagnosis,* had always been the issue in the case."[29]

### A

Defendants' lawyers *did not object* when Dr. Thoman testified that treatment should begin *"within an hour after"* an *"initial diagnosis"* of meningitis *"is considered."* They objected when, thirty to forty minutes later, Dr. Thoman said, *"diagnosis must be made as rapidly as possible."* The objection was that delay in making a *diagnosis* of meningitis was not an issue, not that "delay in making a diagnosis" was not an issue.

It was the judge—not defendants' lawyers—who raised the question whether Ericca had alleged delay in treatment.

The lawyers' objection to trying the issue of delay in *diagnosis* was transformed by the judge into an objection to trying the issue of delay in *treatment.* This was further transformed, through mischaracterization, into an objection to trying the "new" issue of *delay in administering ampicillin.*[30]

### B

Ericca's expert witness, Dr. Thoman, was asked at the trial at what point in time treatment should begin when "the spinal fluid is cloudy but you

---

[29] *Ante,* p 323 and n 7 (emphasis added).

[30] See n 20 and accompanying text.

don't have all of these other tests back?"[31] He responded *without objection:*

> If the spinal fluid is cloudy, then that's a very high indication that this is in fact a meningitis and *treatment must begin actually from the time you think of meningitis.* The spinal tap, I.V. and antibiotics, everything must begin actually *within an hour after all this transpires.* So once the initial diagnosis is considered, the tests and the medications are started in order to treat that. And generally, and for the last well over two decades since I was an intern, it's been *within an hour* after that's considered the treatment has to begin. [Emphasis added.]

Dr. Thoman's testimony continued for another thirty to forty minutes when, in responding to the question why he was of the opinion that the standard of care was breached by Dr. Kim, he said that "*diagnosis* must be made as rapidly as possible." The physicians' lawyer objected that "[*d*]*elay in making a diagnosis* of meningitis had not been an issue in this case . . . ."

The judge asked Ericca's lawyer whether he had ever claimed that the doctors violated the standard of care by delay in making a diagnosis. He responded that he "did not understand Dr. Thoman's opinion to state that the diagnosis was delayed, but that treatment was delayed." He added that Dr. Thoman's testimony was "that

[31] The majority characterizes this inquiry as "a general statement of good medical practice" and asserts that "good medical care" is not a description of the "applicable standard of care," and argues: "When plaintiff did suggest that Dr. Kim violated the standard of care in this regard, defense counsel moved to strike the answer." *Ante,* p 323, n 7.

I do not understand on what basis the majority seeks to distinguish between "good medical practice" and "standard of care." Any motion to strike was not addressed to Dr. Thoman's response to this inquiry, and, in all events, was made after the judge, not the lawyer, raised the question whether there was an "allegation as to a delayed treatment."

there was a delay in treatment once that diagnosis had been obtained."

The judge then turned to the physicians' lawyer and asked, "Are you claiming that there is no allegation as to a delayed treatment?" She responded: "Yes, in this with respect, yes."

From that moment on, the inquiry became whether delay in treatment, timeliness in medication, not delay in diagnosis, was an issue, and Ericca's lawyer was prevented from presenting evidence concerning the importance, indeed urgency, of medicating Ericca with chloramphenicol.

The judge then instructed the jury that "timeliness of the administration of medication is not going to be an issue in this case," and struck Dr. Thoman's testimony concerning timeliness of medicating Ericca with chloramphenicol.

The testimony stricken was not that administration of ampicillin—the ineffective drug—should have been begun within an hour, but rather that chloramphenicol, or other appropriate medicine, should have been administered within the hour.

C

In stressing that it was the judge who introduced the issue whether delay in administering chloramphenicol was an issue, I do not wish to be understood as saying that a judge may not raise issues, and must sit like the proverbial bump on the log. My point, rather, is that it was not until the judge raised the issue that the defendants claimed that timeliness/delay were not issues.

The failure of defendants' lawyers to object on the basis that timeliness/delay in treatment was not an issue until the judge raised the issue suggests that they were on notice that timeliness/delay was an issue. The record shows that they

were indeed on notice through Dr. Thoman's deposition and the mediation statement.