# STATE OF MICHIGAN

# COURT OF APPEALS

GERALD L. WISNER and KAY E. WISNER,

Plaintiffs-Appellants,

v

SB INDIANA LLC, WBM LLC, QUANTUM
MANAGEMENT & INVESTMENTS LLC, and
GREGGORY HARDY,

Defendants-Appellees.

UNPUBLISHED
February 9, 2017

No.   328867
Lenawee Circuit Court
LC No.   13-004674-CB

---

THEODORE J. DORR and THEODORE J. DORR
LLC,

Plaintiffs-Appellants,

v

WBM LLC, QUANTUM MANAGEMENT &
INVESTMENT LLC, and GREGGORY HARDY,

Defendants-Appellees.

No.   333045
Lenawee Circuit Court
LC No.   12-004566-CB

---

Before:  WILDER, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

In Docket No. 328867, plaintiffs, Gerald L. Wisner and Kay E. Wisner (the Wisners), appeal by right an order granting defendants, SB Indiana, LLC (SB Indiana), WBM LLC (WBM), Quantum Management & Investments LLC (Quantum), and Greggory Hardy (Hardy), an involuntary dismissal of the Wisners' claims.

In Docket No. 333045, plaintiffs, Theodore J. Dorr and Theodore J. Dorr, LLC (Dorr), appeal by right an order of no cause of action in favor of defendants, WBM, Quantum, and Hardy.

-1-

The cases have been consolidated on the Court's own motion.[1]  Finding no errors warranting reversal in either case, we affirm.

## I.  BASIC FACTS AND PROCEDURAL HISTORY

Both the Wisners and Dorr sold real property and realized substantial income as a result. They sought tax deferment under a "1031 Exchange."  To avoid incurring tax liability on the sale of property, a taxpayer may structure an exchange in accordance with the United States Tax Code, 23 USC 1031.  Such an exchange permits a property owner to take the sales proceeds from appreciated property and invest the monies in new property to defer the recognition of the taxable gain.  Hardy was a real estate broker who had a history with both the Wisners and Dorr. Hardy identified two companies – SB Indiana, which held commercial property in Indiana, and WBM, which held commercial property in Ohio – as a means of accomplishing such an exchange.  The Wisners (now divorced) were members of both, owning a 31% interest in SB Indiana and an 11% interest in WBM.  Dorr was a member of WBM, owning a 28% stake, but had no interest in SB Indiana.  SB Indiana and WBM were managed by Quantum, a company wholly owned by Hardy.

After a number of years, Quantum and Hardy found it necessary to issue capital calls to the members of both companies.  When the Wisners and Dorr refused to participate in the capital calls, they were divested of their membership in accordance with the companies' operating agreements.

Dorr filed his complaint against WBM, Quantum and Hardy on October 18, 2012.  The Wisners filed their complaint against SB Indiana, WBM, Quantum and Hardy on February 15, 2013.  The complaints alleged that Hardy and Quantum had loaned money to both WBM and SB Indiana as far back as 2006, totaling over $300,000.  These loans, which the Wisners and Dorr claimed were made without notice to the members and without their approval, were ostensibly made to avoid a capital call.  The complaints alleged that "the fact that Hardy supposedly executed the loans 4 to 5 years ago without executing a capital call at that time and, instead, continued to issue profit payments to the investors during the same period is not rationale [sic] and is a strong indication of fraud on behalf of the Defendants."  The complaints alleged that when Hardy issued the capital call in June 2012, he refused to provide even the most cursory information regarding the loans and did not provide a copy of the full operating agreements.  The complaints alleged that once Hardy did provide some accounting information, it was clear that a "vast majority of entries failed to specify what or who the source of the supposed loan was and to what or who the payments for the loan were made."  The complaints alleged that there was significant comingling of funds and questionable transfers of assets.  The Wisners and Dorr believed Hardy was fraudulently utilizing funds for purposes outside the scope of their investment by using funds from separate entities to cover expenses for each other, including "suspicious" new entities.  While Hardy was a sophisticated business person, the Wisners and

---

[1] *Gerald L Wisner v SB Indiana LLC*, unpublished order of the Court of Appeals, entered January 9, 2017 (Docket No. 328867); *Theodore J Dorr v WBM, LLC*, unpublished order of the Court of Appeals, entered January 9, 2017 (Docket No. 333045).

Dorr claimed to be "simple farmers and had little knowledge or understanding of the nature of the complex business transactions Hardy was orchestrating." The complaints' common counts included: accounting, unjust enrichment, constructive trust and appointment of a receiver, breach of fiduciary duty, quantum meruit, membership oppression under MCL 450.4515, and judicial dissolution and winding up. The Wisners' complaint included a count for membership oppression.

The Wisners and Dorr sought to consolidate both cases. Defense counsel objected to a consolidation, but acknowledged that he did not want to try the cases twice. He suggested that there be a "joint hearing" where witnesses' "testimony could count in both trials so that we are not duplicating that testimony. So, it may be that you can fashion this in a different way other than complete consolidation . . ." The trial court agreed. The Wisner case went first because it had more witnesses in common and more defendants.

## A. THE WISNER CASE

At trial, the Wisners alleged that Hardy never disclosed that he was loaning the companies money and never sought any approval from the members. The Wisners claimed Hardy provided very little information and that he breached his fiduciary duty to the businesses as well as the members by engaging in a pattern of conduct designed to deceive them. They contended that Hardy artificially made it look like the entities were profitable when they were not. When things started to get better, he made a capital call, knowing that the investors would not be able to meet the call.

At the close of the Wisners' proofs, defense counsel moved for a "directed verdict," arguing that there was no question that Quantum, not Hardy, was the manager of the entities and that there was no breach of fiduciary duty because the manager's duty was to the entities, not the individual members in the absence of a special relationship. Counsel further argued that there was no shareholder oppression because Quantum acted in conformity with the operating agreements, which permitted capital calls. Additionally, because of express contracts, the Wisners' claims for unjust enrichment and quantum meruit failed.

The trial court corrected defense counsel that his motion was not one for directed verdict (as in the case of a jury trial) but was a motion for involuntary dismissal under MCR 2.504(B)(2). As such, the trial court was called upon to exercise its role as trier of fact, making findings of fact and conclusions of law. The trial court indicated that it relied on the management agreement. The trial court "also paid particular attention to the operating agreements for these business entities," including the provisions regarding capital contributions and failures to contribute.

The trial court noted that § 450.4404 of Michigan's Limited Liability Company Act, MCL 450.4401 *et seq.*, requires that the fiduciary duty owed is to the company and not its individual members:

> [A] manager's fiduciary duties are owed to the company and not to individual members. That's important because in this case we do not have a situation where all the members joined together to sue the manager. Instead we have just a couple

-3-

of the members who sued not only the manager but also the individual companies themselves. SB Indiana, WBM and Quantum Management Investment were all sued in addition to Greggory Hardy.

The trial court determined that there was no real distinction between Hardy and Quantum and that for all intents and purposes Hardy was the manager. But even if Hardy was the manager, Hardy had no duty to the Wisners, individually. There was no evidence of a special relationship between them and there was no evidence that Hardy was guilty of illegally commingling funds.

The trial court sympathized with the Wisners' hesitancy to make the capital call but that did not change the fact that the operating agreements and management agreements "do control in this matter, and those agreements appear to have given Mr. Hardy the authority as manager to make the capital call as he did. They also appear to have given Mr. Hardy the authority to make the advances on behalf of the company as he did." The trial court further noted that there was no evidence that Hardy used the capital call as a way to force the Wisners out.

As for the Wisners' claim of member oppression, the trial court noted that MCL 450.4404 had no application if the conduct at issue was authorized by an operating agreement: "So to the extent that any of Mr. Hardy's actions were authorized by the agreements, then he cannot be found to be willfully unfairly or oppressing these members. Likewise the case law has indicated that even a breach of those operating agreements would not be enough to find that he was willfully unfair and oppressive in his conduct."

The trial court summarized the Wisners' arguments and still found that they were not entitled to relief:

> The plaintiffs have argued that Mr. Hardy was expanding his own business; that he was an inexperienced manager with only two or three properties back in 2005; that he wanted to make these investments appear to be doing well; that he extended the loans to cover the expenses and failed to disclose those loans specifically to the members; that all communications were from Hardy until the loans were actually disclosed; that Hardy himself claimed to be the manager on occasion; that the agreements were executed without the members [sic] knowledge; and that the members thought Gregg Hardy was the manager. I don't disagree with any of those statements, but I don't believe that any of those, in and of themselves, would be sufficient to allow plaintiffs the relief that they seek in this matter.

The trial court concluded that there was no purposeful deceit and that the Wisners would have been on notice of the financial situation had they reviewed their documents. And while Hardy's failure to explain things to the members was troublesome, the trial court concluded that it did not amount to illegal or oppressive conduct. The trial court further determined that there was nothing in the operating agreements that prevented Hardy from issuing loans while simultaneously providing the members with cash distributions. Nor did the trial court conclude that Hardy was guilty of self-dealing or that he needed to seek approval for the loans under the operating agreements: "The operating agreements did provide to allow him to make those advances on behalf of the company. They also provided for interest in excess of what he was

-4-

charging." The trial court noted that "while the plaintiffs did sustain a significant loss by being diluted out of their entire investment that does appear based on the evidence to have been authorized by the agreements under the circumstances. While Mr. Hardy increased his ownership in the process, and that does cause some concern for the Court, it does appear that it was again appropriate and allowed for by the agreements." The trial court ruled that both the quantum meruit and unjust enrichment claims failed because there was an express contract.

The trial court granted defendants' motion for involuntary dismissal.

## B. THE DORR CASE

The Dorr complaint mirrored the complaint in the Wisner matter with the exception that the Dorr complaint failed to allege a shareholder oppression claim under MCL 450.4515. The trial court nevertheless allowed Dorr to amend the complaint because there "does not appear to be any surprise or prejudice resulting from this Court allowing the addition of a membership oppression claim" in light of the fact that defendants "were prepared to proceed to trial on the membership oppression claim in this immediate matter." Dorr's failure to properly caption his causes of action was not the result of undue delay, bad faith, dilatory motive and did not prejudice defendants.

The trial court further noted that "the prior jurist in this matter effectively consolidated the claims for discovery purposes and this Court, upon agreement between the parties, ruled that all evidence and testimony introduced during the *Wisner* trial, which was to be conducted first, would be deemed to be evidence and testimony allowed to be used in the immediate case, as the issues were seen to be largely duplicative." After allowing Dorr to amend his complaint, the trial court went on to address defendants' motion for "Involuntary Dismissal, Directed Verdict, and/or Summary Disposition":

> Defendants are correct in their position that this Court made previous rulings in the *Wisner* matter that will bar claims in this immediate matter. As previously ruled upon by this Court, Plaintiffs' claim for unjust enrichment is precluded as the Operating Agreement has been considered an express contract covering the disputed subject matter. . . .Likewise, the Operating Agreement also bars Plaintiffs' claim for *quantum meruit*, it having been found to be an express contract governing the parties' business with each other. . . .

> However, this Court did previously rule that Plaintiffs were members entitled to an accounting . . .and that Defendant Greggory Hardy was effectively the manager of the LLC, having held himself out accordingly. Finally, although this Court has ruled that Defendant Hardy held himself out as the manger [sic], his fiduciary duty is solely to the company, WBM, LLC, and not the individual members. . . . While these plaintiffs are bound by the adverse rulings in the companion *Wisner* case, they too shall benefit from the prior rulings favorable to them. Therefore, if Plaintiffs prevail in successfully establishing their member oppression claims, they may be able to seek dissolution, or any other relief afforded by MCL 450.4515(1).

Therefore, the Dorr trial focused solely on his claim that Hardy engaged in oppressive conduct when he stopped all communications with Dorr following the capital call.

After hearing evidence in the Dorr trial, the trial court dismissed Dorr's only remaining claim for membership oppression:

> Plaintiff alleges that Defendant Hardy cut him off from further communication and Defendant admits the same. However, it does not appear that his rights as a member of the LLC provided by MCL 450.4102(q), including any right to receive distributions of the LLC's assets and any right to vote or participate in management, were substantially interfered with by Defendant Hardy's conduct. While this Court previously expressed its concern with the proposition that cutting off a member from communication could be done so in good faith and was in the LLC's best interest, the testimony established the reasons such drastic action was taken. Although Defendant Hardy substantially interfered with Plaintiff's ability to communicate with him as the manager of the LLC, Defendant Hardy did not engaged [sic] in conduct which was unfair or oppressive. Plaintiff was not denied any of his rights as a member. He was still entitled to vote, examine the books, call for a meeting or the membership, or receive any dividends that were issued.

> Plaintiff has not carried his burden of proof to establish a violation of MCL 450.4515, failing to establish any "willfully unfair and oppressive conduct" toward him as a member of this LLC. As this Court previously opined, expert testimony on the standard of care owed to the LLC and its members would have significantly assisted this Court in understanding the Plaintiff's complaints regarding the conduct of Defendant Hardy. None was provided. This Court cannot make the logical leap that Defendant Hardy's conduct substantially interfered with Plaintiff's interests as a member without evidence sufficient to draw that inference and reach that conclusion. This is especially true since the statute specifically excludes conduct or actions that are permitted by the articles of the organization or an operating agreement. *See* MCL 450.4515(2). Plaintiff's claims relating to the validity of the operating agreement came too late, and were previously excluded by the Court. Finally the argument that a 100% dilution of Plaintiff's membership interests as a result of his failing to make the capitol [sic] call is in itself unfair and oppressive was not supported by any evidence. This Court likewise cannot reach that conclusion without any proof to support it.

Both the Wisners and Dorr appeal as of right, raising identical issues on appeal.

## II. ANALYSIS

As both the Wisners and Dorr agree, their appeals hinge upon the validity and enforceability of the operating agreements. Their substantive claims included membership oppression, unjust enrichment and quantum meruit.

-6-

There was no shareholder oppression if Hardy's actions were permitted under the operating agreements. MCL 450.4515 provides, in relevant part:

(1) A member of a limited liability company may bring an action in the circuit court of the county in which the limited liability company's principal place of business or registered office is located to establish that acts of the managers or members in control of the limited liability company are illegal or fraudulent or constitute willfully unfair and oppressive conduct toward the limited liability company or the member.

\*\*\*

(2) As used in this section, "willfully unfair and oppressive conduct" means a continuing course of conduct or a significant action or series of actions that substantially interferes with the interests of the member as a member. Willfully unfair and oppressive conduct may include the termination of employment or limitations on employment benefits to the extent that the actions interfere with distributions or other member interests disproportionately as to the affected member. *The term does not include conduct or actions that are permitted by* the articles of organization, *an operating agreement*, another agreement to which the member is a party, or a consistently applied written company policy or procedure. [Emphasis added.]

Nor could there have been unjust enrichment or quantum meruit if the parties' were governed by the operating agreements. "A claim of unjust enrichment requires the complaining party to establish (1) the receipt of a benefit by the other party from the complaining party and (2) an inequity resulting to the complaining party because of the retention of the benefit by the other party." *Karaus v Bank of New York Mellon*, 300 Mich App 9, 22–23; 831 NW2d 897 (2012). "[A] contract will not be implied under the doctrine of unjust enrichment where a written agreement governs the parties' transaction." *King v Ford Motor Credit Co*, 257 Mich App 303, 327; 668 NW2d 357 (2003). Likewise, "[t]he theory underlying quantum meruit recovery is that the law will imply a contract in order to prevent unjust enrichment when one party inequitably receives and retains a benefit from another. However, a contract will be implied only if there is no express contract covering the same subject matter." *Morris Pumps v Centerline Piping, Inc*, 273 Mich App 187, 194; 729 NW2d 898 (2006) (internal quotation marks and citation omitted).

And, finally, there was no cause of action for an accounting or judicial winding up if plaintiffs were no longer members, having been divested of their interests pursuant to the operating agreement. Pursuant to MCL 450.4505(4), "a member ceases to be a member when the member's entire membership interest is assigned."

Yet, in spite of the fact that the enforceability of operating agreements – or lack thereof — was paramount to each claim, neither the validity nor the enforceability of the operating agreements was ever truly disputed at the trial court level. In fact, in both cases, it was the plaintiffs who admitted the operating agreements into evidence and sought to use certain provisions therein to show that Hardy had mismanaged the companies. "It is settled that error

-7-

requiring reversal may only be predicated on the trial court's actions and not upon alleged error to which the aggrieved party contributed by plan or negligence." *Lewis v LeGrow*, 258 Mich App 175, 210; 670 NW2d 675 (2003).

At no time did the Wisners allege that the dilution was illegal because the operating agreements were invalid. This new argument was apparently kept in their back pockets for purposes of appeal. "A party is not allowed to assign as error on appeal something which his or her own counsel deemed proper at trial since to do so would permit the party to harbor error as an appellate parachute." *Dresselhouse v Chrysler Corp*, 177 Mich App 470, 477; 442 NW2d 705 (1989).

As for the Dorr matter, it is clear that Dorr challenges the trial court's decision refusing to allow Dorr to further amend the complaint to include allegations that the operating agreement was unenforceable. However, Dorr does not actually brief whether the trial court abused its discretion in refusing to allow the amendment. Instead, Dorr frames the issue as a legal one.

Additionally, as it pertains to both cases, we reject plaintiffs' attempt to categorize certain statements as "findings of fact" by the trial court. Specifically, in granting a directed verdict in the Wisner matter, the trial court noted:

> The plaintiffs have argued that Mr. Hardy was expanding his own business; that he was an inexperienced manager with only two or three properties back in 2005; that he wanted to make these investments appear to be doing well; that he extended the loans to cover the expenses and failed to disclose those loans specifically to the members; that all communications were from Hardy until the loans were actually disclosed; that Hardy himself claimed to be the manager on occasion; that the agreements were executed without the members [sic] knowledge; and that the members thought Gregg Hardy was the manager. I don't disagree with any of those statements, but I don't believe that any of those, in and of themselves, would be sufficient to allow plaintiffs the relief that they seek in this matter.

The trial court's statement "I don't disagree with any of those statements" is a far cry from a finding of fact on each of the enumerated allegations. Instead, the trial court was simply stating that even if those allegations were accepted as true, plaintiffs had not met their burden of proof in light of the fact that Hardy's actions were permitted under the operating agreements.

With these thoughts in mind, we turn to each case.

## A. THE WISNER CASE (DOCKET NO. 328867)

On appeal, the Wisners argue that the operating agreements were not binding on them and that the trial court erred when it concluded that the operating agreements were valid. This novel argument was never raised during their trial. In fact, the record is replete with instances in which the Wisners referred to the operating agreements, with no indication that the agreements lacked enforceability because the Wisners had not signed them. In fact, the Wisners are the ones that had the operating agreements admitted into evidence at trial.

During Hardy's cross-examination, the Wisners' attorney referred to the operating agreements in an attempt to prove that Hardy had not complied with the terms therein. For example, counsel questioned Hardy about a provision in the agreements providing that each member's interest was based on the proportion of their initial capital contribution. The Wisners alleged that Hardy never, in fact, contributed to WBM or SB Indiana. Counsel used the operating agreements to support the contention that Hardy never made an initial contribution to obtain his membership. When defense counsel objected on relevancy grounds, plaintiff's counsel explained: "Your Honor, the reason I am pursuing this line of questioning is because I am trying to question him about the operating agreement which specifically requires that each member provide their capital contribution in exchange for the membership interest. It is required by the operating agreement." Further, plaintiff's counsel argued: "As the manager he would have a duty to abide by the very operating agreement that he is in charge of enforcing. So, if he's not enforcing the agreement as to himself, how could we expect that he can enforce the agreement as to the other members?" The Wisners' attorney believed that the operating agreements were relevant because "I believe that the members have a derivative right as well to enforcement of this agreement, so, they would have a right to make sure that the manager of the entity was, in fact, enforcing this agreement. . . . And, if Mr. Hardy, acting as the manager did not enforce this agreement to the other members, it would certainly go to breach of fiduciary duty. It would go to membership oppression. It would go to possibly unjust enrichment. It would go to all their claims that we are seeking." In questioning Hardy about the framework of investment under the operating agreements, the Wisners' attorney was "trying to lay a foundation as to the particular duty under this agreement." Plaintiffs wanted to show that a manager under the operating agreement was required to ensure that each member made their contribution. Because Hardy was the sole owner of Quantum, which was the manager of both entities, plaintiffs were trying to demonstrate that Quantum and Hardy were one and the same and neglected their duty to manage the entities in compliance with the operating agreement. Hardy conceded that Quantum, as manager, was "in charge of enforcing this entire agreement, the operating agreement . . ."

The Wisners' attorney also questioned Hardy at length about the provision of the operating agreements governing cash distributions. Counsel tried to point out that Quantum continued to pay distributions even though there were outstanding expenses, as evidenced by the continuous loans. He asked Hardy: "Mr. Hardy, if there is being monies loaned to SB Indiana, and, there is being interest charged for those monies loaned, wouldn't it have been the correct move, according to this operating agreement, to not issue distribution checks so it could then pay the money back that is being charged interest on?"

The Wisners' attorney even went so far as to have Hardy read a portion of the WBM operating agreement into the record:

> *Q.* We are on exhibit 25, paragraph three, page three, entitled "Failure to Contribute." Let me know when you've had a chance to review that.

> *A.* Yeah, I've reviewed it.

> *Q.* Um, do you recognize this paragraph?

*A.*  Yeah, it is what I used to enforce against your client.

*Q.*  So, if we could start with the first paragraph, it states, "If any member fails to make a capital contribution when required, the Company may, in addition to pursuing any rights and remedies the Company --

*A.*  "Any other rights and remedies"

*Q.*  – may have" -- well, why don't you read it, please.

*A.*  I would be glad to read it.  "If any Member fails to make a capital contribution when required, the Company may, in addition to pursuing any other rights and remedies the Company may have under this Act or applicable law, take any enforcement action (including, the commencement and prosecution of court proceedings) against the Member that the Managers consider appropriate. Moreover, the remaining Members may elect to contribute the amount of such required capital themselves, according to their respective Units.  The members who make such contributions shall be entitled to treat these amounts as an extension of credit to such defaulting Member, payable upon demand, with interest accruing on the extension at the rate of one (1%) percent per month until paid.  This extension of credit shall be secured by such defaulting Member's Interest in the Company.  Each Member who defaults grants to each Member who may later grant an extension of credit, a security interest in the defaulting Member's Interest in the Company.  Alternatively, at the election of the Managers, the Managers may make a one hundred (100%) percent reduction in the Units of the defaulting Member and reallocate the Member's former Units among the contributing Members in proportion to their Units."

*Q.*  This provides the process then for enforcing capital contributions; is that correct?

*A.*  Yes, absolutely.

*Q.*  And, it provides different remedies that may be taken; is that correct?

*A.*  It has options.

The SB Indiana operating agreement had an identical mechanism for dealing with a member who failed to contribute.  The Wisners were trying to show that Hardy pursued the harshest remedy available when seeking to dilute their shares.

The Wisners' attorney even quarreled with Hardy regarding whether the management agreement superseded the operating agreements.  On cross-examination, defense counsel followed up:

*Q.*  So, the management agreement was signed at the time these operating agreements were entered into in the first place, correct?

*A*. That is correct.

*Q*. Now, these operating agreements, when they were first entered into, the Wisner's [sic] were not parties to these agreements; were they?

*A*. Not the operating agreement.

*Q*. Okay. So, by the time the Wisner's [sic] come in, after enjoying the benefits of tax free money by being a tenant in common and deferring their taxes under 1031, the management agreement has been in place for a couple of years, the operating agreements have been in place for a couple of years; isn't that right?

*A*. That is correct.

Defense counsel then reviewed many provisions of the operating agreements.

Later, the Wisners' attorney did not object when defense counsel and Hardy had the following exchange during re-cross-examination:

*Q*. The operating agreement, as you understand it, gives you the right to do what if they don't make the capital call?

*A*. It gives the management the right to dilute out and allow that dilution to go to the party or company or entity that pays that capital call.

*Q*. There are other options that you could have done, correct? One of them you did do, you waited and negotiated with them for some period of time?

*A*. We did. We waited.

*Q*. The other option would have been to treat it as a loan at one percent per month payable on demand; is that what it provides?

*A*. It provides for that option.

*Q*. What if they don't pay when the loan is demanded?

*A*. Well, then I could have foreclosed on the entity with that loan.

*Q*. Or, sue the Wisner's [sic] for the money?

*A*. I could have done that as well, get a judgement [sic] against them for it.

*Q*. Why did you elect instead after a year of negotiation with the Wisner's [sic] and they electioned [sic] not to pay, to choose the avenue of simply diluting out their interest rather than treating it as a loan and suing them?

*A.* Well, I mean from a practical matter, the process of creating a loan, defaulting the loan, and then taking court action would certainly be problematic and troublesome just to accomplish it. I mentioned one time in testimony here, my job was supposed to be to run the company, spend my time leasing the spaces and doing those kinds of things, creating another collection problem was not going to be productive for the company.

Again, the Wisners' attorney questioned Hardy about the authority to make loans and not issue a capital call:

*Q.* Quantum is obligated to follow this management agreement, correct?

*A.* It is obligated to follow the management agreement, and, the operating agreement. They relate to each other. You are trying to pick them apart as [if] only one of them exists.

At one point during Hardy's redirect-examination, defense counsel objected to a line of questioning regarding the loss of particular tenants:

[Defense counsel]: Again, Your Honor, I object. He's trying to blame fault on a tenant leaving. It's irrelevant. As the Court just ruled, he has to demonstrate acts which were illegal, fraudulent or oppressive, meaning not authorized by the documents. That is not any of those.

THE COURT: . . .any response?

[Plaintiffs' counsel]: The response would be that in the documents regarding the management agreement and operating agreement, he does have such duties as to carry out his management duties in a reasonable manner and if we're able to show that he was doing so in an unreasonable manner that would be in violation of the documents.

The trial court disagreed: "Well, in terms of the statute, in terms of what is actually and willfully unfair or oppressive conduct, it's pretty clear from the case law that simple negligence is not going to be enough a breach of the operating agreement, is not going to be enough to be oppressive."

Plaintiff's counsel then went on to question Hardy about the specific terms of the operating agreement, including the provision that permitted a capital call to enable the company to conduct its business as well as the provision that allowed the manager to dilute the members' shares if the members did not contribute to the capital call.

During arguments on the involuntary dismissal, the Wisners' attorney stated:

The documents certainly conflict as to who the manager was. Mr. Hardy wants to point to the operating agreement, but the management agreement states a different entity, states the actual entity itself will be the managing agent, while the communications from Mr. Hardy all indicate that he's the manager. Again, it's

-12-

only after the loans are disclosed now that suddenly the Quantum letterhead appears and they start hiding behind Quantum as being manager.

Apparently Mr. Hardy had executed these operating agreements at some point on his own without knowledge or disclosing these to the investors when they became a part of this entity and telling them or explaining to them that Quantum was going to be the manager of the entities. All along they were told that Gregg Hardy was the manager.

Counsel then went on to point to provisions in the operating agreements that governed a manager's conduct, including: providing reports to investors, prohibiting self-dealing, and requiring that cash distributions be made after the operating costs are deducted. Counsel argued that Hardy violated all of these.

The foregoing demonstrates that the Wisners never challenged the enforceability of the operating agreements in the trial court. We will not permit them to do so for the first time on appeal.

## B. THE DORR CASE (DOCKET NO. 333045)

While the Wisners were completely silent on the enforceability of the operating agreements, Dorr's attorney attempted to raise the issue at the beginning of trial. During opening statements in the Dorr case, Dorr's attorney set forth his theory of the case:

It is our position that the actions of the manager in diluting him out are not authorized by statute, and, are not authorized by any agreements between the parties. Further, it is our position that the manager either intentionally or unintentionally misled the Plaintiff as to the status of loans that the manager had purportedly advanced to the LLC and then how he was going to recover repayment for those loans and that the capital call itself was inappropriate and came out of the blue and was oppressive in and of itself. And, probably most importantly, we are going to show that there was no operating agreement in this case that applied to Mr. Dorr and therefore his requirements for contribution, if any, were strictly governed by the statute and not by any so called operating agreement. Hence, the call itself, the demand itself, and the subsequent expulsion were all unauthorized, inappropriate, and, certainly constituted oppression causing him damage and resulting in this action and the requests for relief that were contained in our complaint.

Defense counsel objected to that theory, noting that "the statement that there is no operating agreement that applied to Mr. Dorr and that only the statute would govern capital calls is nowhere to be found in that complaint." Defense counsel noted:

They introduced the operating agreements, and, they introduced them as exhibits 25 and 26. They are the operating agreements. They put them in as the binding and functional documents that governed the Plaintiffs in this case. They are now trying to change their complaint that they just amended this week, to allege that he is not a party to the operating agreement and say that only the statute applies.

-13-

There is nothing in the complaint that references that. This is an irrelevant line of questioning based on what is in the pleadings, and, they should not be permitted to go forward.

The trial court likewise observed that "there is nothing pled in the complaint that there is not a valid operating agreement between the parties." The trial court noted that the issue was never raised in the Wisner matter and that defense counsel would be prejudiced by allowing such a strategy to go forward. The trial court made the following observations:

If you would have had it a year ago, somebody should have looked at it and realized that, from your office. This isn't a case where he was pro per and he just got lawyers hired in here today. Discovery was conducted. When you had the opportunity to review the documents, you got through discovery, it should have been brought up to the court's attention, to the defense's attention. You could have filed, at that point and time, to amend your complaint. I would have granted that, graciously. We could have had the issue fully explored. The frustrating part is that you are bringing it up now and it seems to be a very important issue in this matter. It would have been an important issue if it would have been raised in the Wisner matter, which I know you don't want to go back to, but, we spent days in that case too. So, I am just really concerned about [defendants] being prejudiced by these things coming up at the last second when these arguments should have been developed, as you said, years ago.

***

Well, I appreciate the argument.[2] I think it is a good argument. I appreciate your argument in terms of whether or not your client is bound by this operating agreement, but, it is the first time that I have heard of it. I haven't had a chance to look at any of the case law on this, even look at the statute that you've referenced as it relates to this issue, because it wasn't brought up before today. I don't want to make a decision in this matter sitting here on the bench without being fully appraised. At the same time, this matter has been delayed and delayed and delayed. So, I am just really struggling with what is the fair thing to do here for all the parties that are involved, frankly.

The trial court initially indicated that it wanted the parties to brief the issue and that it would allow a continuing objection on the line of questioning regarding the operating agreement. However, the trial court changed its position during the following exchange at which time defense counsel was arguing that he should not have to brief the issue:

[Defense counsel]: Well, there is a written agreement and it is part of the evidence. It was argued, endlessly, in the Wisner matter, which is a part of this

---

[2] That a person cannot be charged to contribute to an LLC unless that person has agreed to do so in writing.

-14-

record, never raised that Mr. Dorr never signed it in a pleading of any kind, including the most recent amendment. Now, Judge, here is the point, when you plead that it is oppression to dilute in the way that they say, and the operating agreement forgives it, you know that the statute says if it is permitted by the documents then it is not willful oppression as a matter of law. So, their argument is, "well, we lost on that already, why don't we change our attack and say he is not a signatory to it, and, we knew that all along for the last two and a half/three years even though the Wisner's [sic] didn't sign anything either, we didn't argue it there, but, let's argue it now and let's see if we can then say, well, it's oppressive under the statutory operating agreement." Judge, it is way too late for that. It is way too prejudicial. They should have done it a long time ago, and, I don't think there is any need to brief it. I think you can find that it is way too prejudicial, and way too late right now.

THE COURT: Well, in thinking about it further and looking at my notes and having the chance to digest the rest of this this afternoon, I agree with [defense counsel]. I think I have enough to be able to make a decision whether or not I am going to consider the 100 percent dilution, the – as being oppressive in and of itself as argued by Plaintiff, whether or not Plaintiff is to be bound by the language of the operating agreement that is in Plaintiff's exhibit 25. I think that there has been enough arguments made here today on the record.

In a later order denying defendants' motion for involuntary dismissal, the trial court acknowledged that "Plaintiff now argues that the Operating Agreement should only bind Defendant Hardy alone and not anyone else since Hardy was the only signatory to the agreement." In a footnote, the trial court rejected this approach:

This allegation was not made in any pleading prior to trial, and was objected to vehemently by the Defendants at trial. Defendants are correct in directing the Court to MCR 2.118(C)(2) which governs the right to amend pleadings at trial to conform to the proofs. The party seeking to amend has the burden of establishing that the objecting party has not been prejudiced. That burden has not been carried, and the objection that this particular issue was not within the issues raised by the pleadings is sustained. This argument is not being addressed further.

Without enumerating it as an issue on appeal or briefing it, Dorr takes issue with the trial court's conclusion that lack of enforceability of the operating agreements was never pled and the trial court's refusal to allow Dorr to pursue such a theory at trial. "Decisions concerning the meaning and scope of pleading, and decisions granting or denying motions to amend pleadings, are within the sound discretion of the trial court and reversal is only appropriate when the trial court abuses that discretion." *Weymers v Khera*, 454 Mich 639, 654; 563 NW2d 647 (1997). "An abuse of discretion occurs when the decision results in an outcome falling outside the principled range of outcomes." *Radeljak v DaimlerChrysler Corp*, 475 Mich 598, 603; 719 NW2d 40 (2006).

The real issue on appeal touches upon the admissibility of evidence as it relates to pleading requirements. Under MCR 2.118(C)(1), pleadings may be amended if an issue was tried by express or implied consent of the parties. "In that case, amendment of the pleadings to conform to the evidence and to raise those issues may be made on motion of a party at any time, even after judgment." MCR 2.118(C)(1). However, where, as here, the evidence is objected to, further amendment is not allowed unless the evidence would not prejudice the objecting party. MCR 2.118(C)(2) provides:

> If evidence is objected to at trial on the ground that it is not within the issues raised by the pleadings, amendment to conform to that proof shall not be allowed unless the party seeking to amend satisfies the court that the amendment and the admission of the evidence would not prejudice the objecting party in maintaining his or her action or defense on the merits. The court may grant an adjournment to enable the objecting party to meet the evidence.

The rule "establishes strict requirements for amending a pleading during trial. Unless the party requesting amendment 'satisfies the court that . . .amendment . . .would not prejudice the objecting party,' amendment 'shall not be allowed.' This rule contrasts sharply with the free amendment allowed before trial." *Dacon v Transue*, 441 Mich 315, 333; 490 NW2d 369 (1992). However, where a defendant receives notice "from whatever source" that a plaintiff intended to assert a claim, there can be no prejudicial surprise. *Id.* at 334. But a "plaintiff may not rely on a facially insufficient allegation, which necessitated the amendment, to alleviate prejudicial surprise caused by the amendment." *Id.* at 335.

There is no question that Dorr did not provide reasonable notice that his theory of the case would contrast with the Wisners' theory. Nor is there any real question that an amendment would have caused prejudicial surprise. A claim that the operating agreement was unenforceable is nowhere to be found in any of the pleadings. Such a new theory posed a significant surprise to opposing counsel in light of the extensive litigation in the Wisner matter, which contained absolutely no reference whatsoever to the enforceability of the agreements. The trial court did not abuse its discretion given Dorr's failure to meet his burden of demonstrating that an amendment of the pleadings would not have prejudiced defendants.

It is clear that the enforceability of the operating agreement was never truly in dispute, as it was not timely raised. Dorr, in fact, relied heavily on the operating agreement to bolster his claim for membership oppression. We reject Dorr's attempt to fashion the issue on appeal in a manner that is in direct contrast to what was presented in the trial court.

Affirmed. As the prevailing party in both cases, defendants may tax costs. MCR 7.219.

/s/ Kurtis T. Wilder
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly

-16-